STATE OF NORTH CAROLINA v. WILLIAM CHRISTOPHER GOODE

No. 40A98

(Filed 9 April 1999)

### 1. Arrest— probable cause for warrantless arrest

Officers had probable cause to arrest defendant where an officer observed three black males at the scene of two murders before they fled; one of the males had on a jacket with bright yellow showing at the collar and sleeve; defendant's brother was arrested near the scene with the wallet of one of the victims in his pocket; defendant thereafter arrived at the scene, indicated that his brother lived there, and inquired as to what had happened; an officer noticed that defendant had a large bloodstain on the cuff of his bright yellow, long-sleeved shirt; and other officers noticed bloodstains on defendant's tennis shoes.

### 2. Search and Seizure— bloodstained clothing—item from victim—seizure incident to lawful arrest

Bloodstained clothing and shoes taken from defendant at the sheriff's office and the murder victim's partial dental plate removed from defendant's pocket were seized incident to a lawful arrest and were admissible in defendant's murder trial.

### 3. Constitutional Law, North Carolina— unrecorded bench conferences—defendant in courtroom—constitutional rights not violated

The trial court did not violate defendant's state constitutional right to be present at every stage of his capital trial by holding unrecorded bench conferences with the prosecutor and defense counsel but without defendant himself before excusing two prospective jurors for hardship reasons where defendant was present in the courtroom at all times.

### 4. Jury— challenge for cause—death penalty views—life imprisonment sentence

Defendant was not prejudiced by the trial court's excusal of a prospective juror for cause because of her death penalty views where the jury recommended life imprisonment. Furthermore, the trial court did not err in excluding this juror for cause where, after the prosecutor's challenge for cause and a brief attempt at rehabilitation by defense counsel, the trial court questioned the prospective juror and she stated unequivocally that she would be unable to render the death penalty.

### 5. Jury— denial of challenge for cause—prerequisites for appeal

In order to preserve the right to appeal a denial of a challenge for cause, a defendant must have exhausted his peremptory challenges, renewed his challenge for cause, and had his renewed motion denied. N.C.G.S. § 15A-1214(h).

### 6. Evidence— photographs—murder victims while alive—crime scene—victims' bodies at scene and autopsies

The trial court did not err by admitting photographs of two murder victims while alive. Nor did the trial court abuse its discretion in the admission of color photographs of the crime scene, the victims' bodies at the crime scene, and the victims' bodies during the autopsies where the photographs illustrated the testimony of various witnesses, including the first responder, law officers, and the forensic pathologist who performed the autopsies; the crime scene contained many pieces of evidence that required documentation; and the record does not show that these photographs were used excessively and solely to inflame the passion and prejudice of the jury against defendant.

### 7. Aiding and Abetting— presence at scene—encouragement or assistance

A person is not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission; to be guilty he must aid or actively encourage the person committing the crime or in some way communicate to this person his intention to assist in its commission. The communication or intent to aid does not have to be shown by express words of the defendant but may be inferred from his actions and from his relation to the actual perpetrators; furthermore, when the bystander is a friend of the perpetrator

STATE v. GOODE

[350 N.C. 247 (1999)]

and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement.

**8. Aiding and Abetting— first-degree murder—premeditation and deliberation—sharing of criminal intent**

Where a defendant aids and abets the perpetrator in the commission of a first-degree murder based on premeditation and deliberation, he shares the criminal intent of the perpetrator and thus possesses the requisite mens rea and specific intent for that crime.

**9. Aiding and Abetting— first-degree murder—sufficiency of evidence**

The evidence was sufficient to support defendant's conviction of two first-degree murders based on the theory of aiding and abetting where it tended to show that defendant was the younger brother of one perpetrator and a friend of the second perpetrator; defendant was present with his brother and the friend when the male victim arrived at the brother's mobile home to ask about the rent and when the friend began an assault on the male victim and his brother joined in the attack; when the friend went into the mobile home, leaving defendant's brother alone fighting with the male victim, defendant kicked the victim in order to aid his brother; defendant remained nearby when his friend and his brother stabbed the male victim to death; when the female victim arrived and the friend said that he had to "take her out too," defendant knew that the friend meant that he would kill her; defendant stood only ten feet away as he watched the friend throw the female victim down, beat her, and stab her to death; defendant assisted the friend in moving the bodies to the back of the male victim's truck; and defendant also helped clear the area of evidence.

**10. Aiding and Abetting— first-degree murder—friend exception to mere presence rule—instruction supported by evidence**

The trial court did not err by instructing the jury in a prosecution for two first-degree murders on the "friend" exception to the mere presence rule under the theory of aiding and abetting where the evidence indicated that defendant was the brother of one perpetrator and the friend of the second perpetrator; defendant was present when the friend began an assault on the male vic-

**STATE v. GOODE**

[350 N.C. 247 (1999)]

tim and when his brother joined in the attack; when the friend left, leaving defendant's brother alone fighting with the male victim, defendant kicked the victim in order to aid his brother; defendant remained nearby when his brother and the friend stabbed the male victim to death; when the female victim arrived and the friend said that he had to "take her out too," defendant knew that the friend meant that he would kill her; defendant stood only ten feet away and watched the friend throw the female victim down, beat her, and stab her to death; defendant assisted the friend in moving the bodies; and defendant also helped clear the area of evidence. Not only did defendant know that his presence would be taken as an encouragement and protection to his brother and his friend, his presence was in fact relied upon by both the brother and the friend when defendant provided them with active assistance and protection.

## 11. Jury— individual poll of jurors—showing in record

Contrary to defendant's contention that the trial court failed to individually poll all twelve members of the jury concerning their assent to verdicts finding defendant guilty of two first-degree murders, the record reflects that each juror was individually polled and that each assented to the guilty verdicts where the record shows that the trial court stated that it would have each of the jurors stand individually and ask if each juror still assented or agreed with the verdict announced in open court; the record indicates that the court individually polled the foreman as to each verdict and then went back to juror number one and repeated the process; the record contains a parenthetical by the court reporter that the jury was polled in open court and that each juror answered that the verdict returned by the foreman was his or her verdict and each still assented thereto; and the trial court, in finding that the announced verdict was a unanimous verdict of all jurors, stated that the jurors had been polled individually.

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review judgments imposing consecutive sentences of life imprisonment and fourteen years' imprisonment entered by Stephens (Ronald L.), J., at the 28 November 1994 Criminal Session of Superior Court, Lee County, upon jury verdicts of guilty of two counts of aiding and abetting first-degree murder and one count of aiding and abetting robbery with a dangerous weapon. Heard in the Supreme Court 14 January 1999.

## STATE v. GOODE

[350 N.C. 247 (1999)]

*Michael F. Easley, Attorney General, by Teresa L. Harris, Assistant Attorney General, for the State.*

*Staton, Perkinson, Doster, Post, Silverman, Adcock & Boone, P.A., by Jonathan Silverman, for defendant-appellant.*

PARKER, Justice.

Defendant William Christopher Goode was indicted on 30 March 1992 for first-degree murder in the killing of victim Margaret Batten and for first-degree murder and robbery with a dangerous weapon in the killing and robbery of victim Leon Batten. His first capital trial resulted in a mistrial. He was tried capitally a second time, and the jury found him guilty of two counts of aiding and abetting first-degree murder and one count of aiding and abetting robbery with a dangerous weapon. Following a capital sentencing proceeding, the jury recommended a sentence of life imprisonment with respect to the first-degree murders, and the trial court entered judgment accordingly. On the robbery with a dangerous weapon conviction, the trial court sentenced defendant to a consecutive sentence of fourteen years' imprisonment. For the reasons discussed herein, we conclude that defendant's trial was free from prejudicial error.

The evidence presented at trial tended to show that on the evening of Saturday, 29 February 1992, defendant and his older brother, George Goode, went out driving in George's wife's car with two friends, Eugene DeCastro and Glenn Troublefield. At one point, George and DeCastro got out of the car and robbed a man named Lamont Wiggins of a gold chain and a Champion jacket. Back behind the wheel, George started driving wildly and "playing chicken" with oncoming traffic; eventually, he lost control and drove the car into a ditch. After some men helped them pull the car out of the ditch, defendant and the others went to a store and bought wine. While driving again, George began taking his hands off the wheel and dancing to music; again he lost control of the car and drove into a ditch. This time the four could not move the car out of the ditch; so they left it there. Troublefield left the others at this point, walking or running down the road. The other three went on foot a short distance through some fields to George's mobile home in the Dallas Mobile Home Park in Bentonville.

A neighbor who saw the car in the ditch went to George's mobile home and asked if everyone was all right. Shortly after the neighbor left, Leon Batten, George's landlord, happened to drive up in his tan

Toyota pickup to ask about unpaid rent that was due. Batten had gone by earlier in the day and had left a note on the door about the rent. George, DeCastro, and defendant went outside with Batten; and Batten and George began discussing or arguing about the rent. When Batten turned around, DeCastro struck him with his fist in the back of the head, staggering him; George joined in, beating and kicking Batten. A short while after this assault began, DeCastro went inside the mobile home, momentarily leaving George fighting with Batten alone. The two were rolling around on the ground. Although George was in the United States Marine Corps and Batten appeared to defendant to be in his fifties, defendant testified that, at one point, Batten was "getting the best of my brother"; so defendant kicked Batten, thereby allowing his brother to get up off of the ground. Batten came up to his knees. At this point DeCastro came out of the mobile home with a nine-inch long butcher knife and began stabbing Batten. George also began stabbing Batten, but defendant could not see what weapon George was using. Defendant was standing six to seven feet away while George and DeCastro stabbed Batten to death.

The medical examiner found, in addition to multiple bruises, abrasions, and stab wounds on the body, neck, and head, a large stab wound in the middle of Mr. Batten's chest which fractured the left fourth and fifth ribs and cut through the heart and lower portion of the right lung. This wound which caused bleeding within the pericardial sac and in both chest cavities was the probable cause of death with the injuries to the head serving a contributing role.

Margaret Batten, Leon Batten's wife, had been told by a neighbor that there was a fight in the trailer park; and she immediately got in her car and drove there, pulling up beside her husband's truck at George's mobile home. DeCastro said, "I got to take her out too." Mrs. Batten got out and began walking toward Mr. Batten's prostrate body. DeCastro threw her to the ground by her neck; kicked her; and stabbed her for two or three minutes, ultimately killing her, while defendant stood ten feet away.

The autopsy revealed twelve closely spaced stab wounds in the middle of Mrs. Batten's chest, three of which went completely through the heart and eleven of which went through the lungs. There were also stab wounds to her lower chest, side, and buttocks; cuts through the stomach, spleen, liver, and kidney; and cuts to the esophagus. Mrs. Batten received a minimum of twenty-three stab wounds, several of which were so deep that after going through the organs,

they actually pierced the back of the chest cavity. She also had cuts on her right hand and fingers and multiple abrasions and lacerations on her head. The cause of death was the multiple stab wounds to the chest and abdomen.

DeCastro then asked defendant to help move the bodies into the back of Mr. Batten's truck, which defendant did. Defendant helped clear the area of evidence and picked up Mr. Batten's partial dental plate, putting it in his pocket. Defendant, DeCastro, and George had started to go through Mr. Batten's wallet when Detective Michael Bass arrived at the scene in his patrol car.

When Detective Bass pulled up, he saw three men. One, who turned out to be George, had on dark-colored coveralls and was kneeling, going through credit cards. The other two were standing beside him: One, DeCastro, was wearing a camouflaged jacket; and the other, defendant, had on a jacket with bright yellow showing at the collar and sleeve. When they saw the police car, they fled behind the mobile home and into a wooded area. Detective Bass then saw the blood-strewn area and discovered the bodies of Mr. and Mrs. Batten in the back of the pickup truck.

George, making his way from the scene on a nearby road, was stopped shortly thereafter by Lieutenant Ron Reynolds, who was responding to a call from Detective Bass. Lt. Reynolds drove George back to the scene of the crime, where Detective Bass identified him as one of the suspects who had fled. When George was searched, Leon Batten's wallet was found in his front pocket.

Defendant, meanwhile, ran out to a road, and while walking away from the direction of the crime scene, hitched a ride from a man named Clarence Atkinson. Atkinson asked defendant where he was going; and defendant named a place which was apparently in the opposite direction, that is, back toward the crime scene. Atkinson turned the car around. At that point Atkinson saw the flashing lights of the police cars at the mobile home park and said he wanted to see what was going on; so he pulled into the mobile home park. Defendant got out of the car, went over to the crime scene, and, indicating that his brother lived at the cordoned-off mobile home, asked the officers, "Where's my brother at (sic)?"

Lt. Reynolds noticed that defendant was wearing a bright yellow, long-sleeved shirt and that there was a bloodstain around the cuff of his sleeve. Lt. Reynolds handcuffed defendant, told him he

was under arrest, and turned him over to Detective Tommy Beasley. Detectives Bass and Beasley noticed blood spatters on defendant's white K-Swiss tennis shoes in addition to the large spot of blood on his left cuff.

Detective Beasley gave defendant his *Miranda* warnings while driving him to the sheriff's office in his patrol car at 9:36 p.m. Shortly after they left, Clarence Atkinson, who had found defendant's blood-stained jacket in the front seat of his car, brought it to the officers at the crime scene.

At the sheriff's office Detective Beasley asked defendant to remove everything from his pockets; one of the things defendant removed was Mr. Batten's partial dental plate. Detective Ned Summerlin then again read defendant the *Miranda* warnings. Defendant signed a waiver of his rights, and at 10:00 p.m. he gave a statement relating the events as they had occurred that evening.

Other officers found Eugene DeCastro with the help of an SBI airplane and infrared tracking devices.

## PRETRIAL ISSUES

In defendant's first two assignments of error, he argues that he was unlawfully arrested without probable cause and that the trial court erred in failing to suppress the clothing and partial dental plate seized from him without a warrant and in the course of an unlawful arrest.

Initially we note that defendant has not properly preserved for appellate review the issue of the lawfulness of the arrest. Defendant did not object to the legality of the arrest either in his pretrial motion to suppress the clothing and dental plate or at the hearing on the motion to suppress. At the hearing the prosecutor began by saying, "It appears the defense does not challenge the constitutionality of the arrest in his motion." Defense counsel did not respond to this with any clarity. Later, in closing argument at the hearing, the prosecutor again noted that "defendant in his motion does not . . . address the question of the legalities of his arrest." Defense counsel was thereafter invited by the trial court to respond; and counsel simply said, "No response to that, your honor." Nevertheless, the trial court addressed the legality of the arrest in its conclusions of law as a necessary part of determining whether the seizure of the clothes and dental plate was lawful.

**[1]** This Court must likewise address the lawfulness of the arrest as part of its analysis of the legality of the seizure of the clothing and dental plate. We conclude that the officers had probable cause to arrest defendant, and that the arrest was lawful. The uncontroverted evidence presented at the hearing showed that Detective Bass had observed three black males at the scene before they fled and had communicated this information to Detective Beasley and Lt. Reynolds. George Goode had then been arrested with the wallet of one of the victims in his front pocket. Defendant thereafter arrived at the scene, indicated that his brother lived there, and inquired as to what was happening and his brother's whereabouts. Lt. Reynolds, noticing that defendant had a large bloodstain on the cuff of his bright yellow, long-sleeved shirt, handcuffed him and told him he was under arrest. Other officers also noticed bloodstains on defendant's tennis shoes. In sum, the officers at the scene of the crimes were presented with a person who potentially fit the general description of the black males who fled the scene; who identified himself as the brother of a man found with the victim's wallet on his person; and who, most importantly, had bloodstains on his clothing. These circumstances amply supported the officers' reasonable belief that defendant played some part in the crime. *See State v. Farmer*, 333 N.C. 172, 181-89, 424 S.E.2d 120, 124-30 (1993) (officers had probable cause to make arrest where the defendant was seen with blood on his pants, shirt, arms, and face, and with scratches on his face and neck, and where he gave officers a false name); *State v. Small*, 293 N.C. 646, 654-55, 239 S.E.2d 429, 435 (1977) (officers had probable cause to make arrest where the defendant was seen wearing bloody clothing within two hundred feet of the place in which the victim was discovered, and officers saw the bloody clothing later in the defendant's home). Thus, even if the issue of the legality of the arrest had been properly preserved by defendant, he could not prevail in his contention that probable cause to arrest him did not exist.

**[2]** Defendant next argues that the clothing taken from him at the sheriff's office and the partial dental plate removed from his pocket must be suppressed since they were seized as a result of an unlawful arrest without probable cause. We conclude, however, that since the arrest of defendant was lawfully made, the search of defendant's person and the seizure of both his clothing and the dental plate were also lawful. A search without a search warrant may be made incident to a lawful arrest. *State v. Hardy*, 299 N.C. 445, 455, 263 S.E.2d 711, 718 (1980). " 'In the course of [a] search [incident to arrest], the officer

may lawfully take from the person arrested any property which such person has about him and which is connected with the crime charged or which may be required as evidence thereof.' " *State v. Harris*, 279 N.C. 307, 310, 182 S.E.2d 364, 366-67 (1971) (quoting *State v. Roberts*, 276 N.C. 98, 102, 171 S.E.2d 440, 443 (1970)). In this case defendant was under lawful arrest at the time he was asked by Detective Beasley to empty his pocket containing the dental plate and at the time his clothing and tennis shoes, stained with blood from the crimes, were taken from him. Therefore, these items were lawfully seized; and the trial court did not err in allowing their admission into evidence. Defendant's assignments of error are overruled.

## JURY SELECTION

[3] In defendant's next assignment of error, he argues that the trial court erroneously excused prospective jurors Wilma Diven and Robert Harmon without defendant's consent and without motion from either party. The gist of defendant's argument seems to be that the trial court violated defendant's state constitutional right to be present at every stage of his capital trial by holding unrecorded bench conferences with the prosecutor and defense counsel but without defendant himself. We have addressed this issue recently, and at length. *See State v. White*, 349 N.C. 535, 545-47, 508 S.E.2d 253, 260-61 (1998); *State v. Buchanan*, 330 N.C. 202, 208-24, 410 S.E.2d 832, 835-45 (1991). A defendant's state constitutional right "to be present at all stages of his capital trial is not violated when, with defendant present in the courtroom, the trial court conducts bench conferences, even though unrecorded, with counsel for both parties." *Buchanan*, 330 N.C. at 223, 410 S.E.2d at 845. The transcript in this case reveals that the trial court was questioning jurors on the record to determine whether they could foresee any hardships that would compromise their obligations as jurors. At a certain point in each colloquy, the trial court called the prosecutor and defense counsel to the bench and held a conference with them off the record. Then, back on the record, the court excused Diven and Harmon, stating the grounds for each hardship excusal and noting that counsel had no objection. The prosecutor and defense counsel were then invited to state anything further for the record and both declined. Defendant was present in the courtroom at all times. In accordance with our prior holdings, we overrule defendant's assignment of error.

[4] Defendant next assigns error to the trial court's granting of the prosecutor's challenge for cause as to prospective juror Darlene

STATE v. GOODE

[350 N.C. 247 (1999)]

Adams. Defendant contends that by excusing Adams, the trial court abused its discretion in violation of *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), since Adams did not unequivocally state that she would be unable to render the death penalty and indicated that she could follow the law. First, even if it was error for the trial court to excuse this prospective juror, the excusal did not prejudice defendant since the jury recommended not the death sentence, but life imprisonment. *See State v. Rannels*, 333 N.C. 644, 655-56, 430 S.E.2d 254, 260 (1993). Had the jury not recommended life imprisonment, we nevertheless could not conclude that the trial court abused its discretion. After the prosecutor's challenge for cause and a brief attempt at rehabilitation by defense counsel, the trial court questioned the prospective juror about her ability to impose the death penalty, concluding ultimately with the following exchange:

> THE COURT: All right. So no matter what I say to you as far as the law and what charge I gave to you or what facts are shown, right now you'll recommend the life sentence if this defendant is convicted of first-degree murder, is that correct?

> [PROSPECTIVE] JUROR ADAMS: Yeah.

Adams thus unequivocally stated that she would be unable to render the death penalty. This assignment of error is overruled.

[5] Defendant next contends that the trial court erred by denying his challenge for cause as to prospective juror Helen McDuffie based upon her inability to follow the law. Defendant argues that because the trial court denied his challenge for cause, he was forced to use one of his peremptory challenges to dismiss the prospective juror and was thereby prejudiced. Defendant, however, has not preserved his right to appeal the denial of his challenge for cause as he did not satisfy the statutory requirements during jury selection. In order to preserve the right to appeal a denial of a challenge for cause, a defendant must have exhausted his peremptory challenges, must have renewed his challenge for cause, and must have had his renewed motion denied. N.C.G.S. § 15A-1214(h) (1997). "The statutory method for preserving a defendant's right to seek appellate relief when a trial court refuses to allow a challenge for cause is mandatory and is the only method by which such rulings may be preserved for appellate review." *State v. Sanders*, 317 N.C. 602, 608, 346 S.E.2d 451, 456 (1986). This assignment is overruled.

STATE v. GOODE

[350 N.C. 247 (1999)]

## GUILT-INNOCENCE PHASE

**[6]** Defendant next assigns error to the admission into evidence of photographs of the victims and of the crime scene. Defendant argues that the numerous and duplicative photographs were inflammatory, gruesome, and unfairly prejudicial. Defendant specifically objects to (i) the photograph of Leon and Margaret Batten taken some time prior to their deaths; (ii) the numerous color photographs of the crime scene, including shots of the victims' beaten and bloody bodies and various parts of their bodies; and (iii) photographs of the bodies taken during the autopsies.

Whether to admit photographic evidence requires the trial court to weigh the probative value of the photographs against the danger of unfair prejudice to defendant. N.C.G.S. § 8C-1, Rule 403 (1992); *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988). This determination lies within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was "manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285, 372 S.E.2d at 527. "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Id.* at 284, 372 S.E.2d at 526.

With respect to the photograph of the Battens when alive, defendant has failed to preserve his contention for appellate review; he neither raised an objection in the trial court, *see State v. Rush*, 340 N.C. 174, 179-80, 456 S.E.2d 819, 822-23 (1995), nor assigned plain error to the photograph's admission, *see State v. Gary*, 348 N.C. 510, 518, 501 S.E.2d 57, 63 (1998). Even if he had preserved the issue, defendant's argument would fail. This Court has previously held that it is not error to admit the photograph of a victim when alive. *State v. Bishop*, 346 N.C. 365, 388, 488 S.E.2d 769, 781 (1997); *State v. Norwood*, 344 N.C. 511, 532, 476 S.E.2d 349, 358 (1996), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997). Furthermore, this photograph was introduced during the examination of the Battens' daughter to illustrate her testimony about her parents' appearance and health prior to their deaths.

Regarding the photographs of the crime scene, the victims' bodies at the crime scene, and the victims' bodies during the autopsies, we conclude that the trial court did not abuse its discretion in ad-

mitting the photographs. The record does not support that these photographs were used excessively and solely to inflame the passions and prejudices of the jury against defendant. The crime scene photographs at issue depicted the condition and location of the victims' bodies at the time they were found, and each photograph showed a unique perspective or contained some subject matter or detail unique to that photograph. Further, these photographs illustrated the testimony of various witnesses, including Douglas Batten, a "first responder" who examined and identified the two bodies; SBI Special Agent David McDougall, who conducted the crime scene search; and Lt. Kenneth Eatman, the chief investigator. The large number of photographs, in itself, is not determinative. This particular crime scene contained many pieces of evidence that required documentation: the multiple wounds to various parts of the bodies, one of Mrs. Batten's shoes, identification cards and papers belonging to Mr. Batten, a wrist watch, a one hundred dollar bill, a wine bottle, a plastic card with blood on it, the position of the two vehicles, and the bloody trail between the two vehicles.

The autopsy photographs illustrated the testimony of Dr. Deborah Radisch, the forensic pathologist who performed the autopsies on the two bodies. Dr. Radisch used these photographs to illustrate her testimony about the multiple injuries inflicted on the victims, the weapons or implements that may have caused such injuries, and the injuries that most likely were the cause of death. In sum, we cannot say that the trial court's decision to admit these photographs was so arbitrary that it could not have been supported by reason. This assignment of error is overruled.

Defendant next assigns error to the trial court's denial of defendant's motion to dismiss all charges at the close of all the evidence. However, defendant has abandoned review as to the robbery with a dangerous weapon charge, since he makes no argument on that charge in his brief. N.C. R. App. P. 28(b)(5). Defendant argues with respect to the first-degree murder charges that no substantial evidence, direct or circumstantial, supported a reasonable inference either of premeditation and deliberation or that defendant possessed the requisite specific intent. Defendant maintains that there is no evidence that he personally inflicted the victims' wounds or that he aided and encouraged George Goode and Eugene DeCastro in murdering the victims.

[7],[8] In ruling on a motion to dismiss a charge of first-degree murder, the trial court must consider the evidence in the light most favor-

able to the State and give the State every reasonable inference to be drawn therefrom. *State v. Elliott*, 344 N.C. 242, 266, 475 S.E.2d 202, 212 (1996), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). A person is guilty of a crime by aiding and abetting if (i) the crime was committed by some other person; (ii) the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime; and (iii) the defendant's actions or statements caused or contributed to the commission of the crime by that other person. *State v. Bond*, 345 N.C. 1, 24, 478 S.E.2d 163, 175 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). A person is not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission; to be guilty he must aid or actively encourage the person committing the crime or in some way communicate to this person his intention to assist in its commission. *State v. Lemons*, 348 N.C. 335, 354, 501 S.E.2d 309, 321 (1998). The communication or intent to aid does not have to be shown by express words of the defendant but may be inferred from his actions and from his relation to the actual perpetrators. *State v. Sanders*, 288 N.C. 285, 291, 218 S.E.2d 352, 357 (1975), *cert. denied*, 423 U.S. 1091, 47 L. Ed. 2d 102 (1976). Furthermore, when the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement. *Lemons*, 348 N.C. at 355, 501 S.E.2d at 321; *State v. Gaines*, 345 N.C. 647, 679, 483 S.E.2d 396, 415, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997). Where a defendant aids and abets the perpetrator in the commission of a first-degree murder based on premeditation and deliberation, he shares the criminal intent of the perpetrator and thus possesses the requisite *mens rea* and specific intent for that crime. *See Gaines*, 345 N.C. at 677, 483 S.E.2d at 414; *State v. Buckner*, 342 N.C. 198, 226-27, 464 S.E.2d 414, 429-30 (1995), *cert. denied*, 519 U.S. 828, 136 L. Ed. 2d 47 (1996); *State v. Allen*, 339 N.C. 545, 557-60, 453 S.E.2d 150, 156-58 (1995), *overruled on other grounds by Gaines*, 345 N.C. at 676, 483 S.E.2d at 414.

[9] Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in its favor, we conclude that substantial evidence exists that defendant aided and abetted George Goode and Eugene DeCastro in the murders of Mr. and Mrs. Batten.

Defendant is the younger brother of George Goode and a friend of Eugene DeCastro. When Mr. Batten arrived at George's mobile home to ask about rent, defendant was present with George and DeCastro when DeCastro hit Mr. Batten in the back of the head. Defendant was there as George and DeCastro began beating and kicking Batten. Defendant testified that when DeCastro went inside the mobile home, leaving George fighting with Batten alone, Batten was "getting the best of my brother." Defendant also testified that because Batten was gaining some advantage over George, defendant kicked Batten. This allowed George to get up off the ground. Mr. Batten then came up to his knees. Directly after this, defendant saw DeCastro come out of the mobile home with a nine-inch butcher knife and watched, from six to seven feet away, as DeCastro and George stabbed Batten to death. When Mrs. Batten drove up, defendant heard DeCastro say, "I got to take her out too," knowing that DeCastro meant that he was going to kill Mrs. Batten. Then, standing just ten feet away, defendant watched as DeCastro went over to Mrs. Batten, threw her to the ground, kicked her, and stabbed her to death. Defendant then helped DeCastro move the bodies into the back of Mr. Batten's truck and remove evidence from the scene. Defendant picked up Mr. Batten's partial dental plate and put it in his pocket. In sum, the evidence demonstrates that defendant intended to assist George and DeCastro, that he in fact assisted them, and that George and DeCastro knew of and relied upon defendant's support and aid. Based on this evidence, we conclude that the trial court did not err in denying defendant's motion to dismiss the charges of first-degree murder under the theory of aiding and abetting. Defendant's assignment of error is overruled.

[10] Defendant next argues, in a related assignment of error, that the trial court erred in instructing the jury on the "friend" exception to the mere-presence rule under the aiding and abetting theory. Defendant contends that the evidence was insufficient to support the friend exception to the mere-presence rule since there was no evidence either that defendant encouraged or intended to assist George and DeCastro or that George and DeCastro knew of defendant's support and encouragement. The trial court instructed as follows:

> Now ladies and gentlemen, I have just indicated the State must prove all these things to you beyond a reasonable doubt from the evidence, including that the defendant knowingly encouraged or aided the actual perpetrator or perpetrators in the commission of a crime. However, members of the jury, I instruct

STATE v. GOODE

[350 N.C. 247 (1999)]

you that a person is not guilty of a crime merely because he is present at the scene of the crime even though he may secretly approve of the crime or silently approve of the crime or secretly intend to assist in its commission. To be guilty, he must aid or actively encourage the person committing the crime or in some way communicate to that perpetrator his intention to assist in its commission if assistance is needed.

In further explanation of these legal principles, the North Carolina Supreme Court has stated with regard to this matter that the mere presence of a defendant at the scene of a crime, even though he is in sympathy with the criminal act and does nothing to prevent its commission, does not make him guilty of an offense which was committed by another in his presence. For the defendant to be guilty of such a crime committed in his presence by another, the State's evidence must prove beyond a reasonable doubt that the defendant was, one, actually present with the intent to aid the perpetrator in the commission of that crime should the defendant's assistance become necessary and, two, that the defendant's intent to aid was communicated to the actual perpetrator in some manner.

Now, ladies and gentlemen of the jury, I charge you that this communication of the defendant's intent to aid, if needed, does not have to be shown by expressed words of the defendant to the perpetrator. It may be inferred from the defendant's actions and from his relation to the actual perpetrator. When a bystander is a friend of the actual perpetrator and when that bystander knows that his presence will be regarded and relied upon by the actual perpetrator as an encouragement and as a protection and assistance of the perpetrator, then presence alone, under those circumstances, may be regarded under our law as encouragement to commit a crime.

First, the trial court's instruction is in accordance with our holdings. *See Gaines,* 345 N.C. at 679, 483 S.E.2d at 415; *State v. Rankin,* 284 N.C. 219, 223, 200 S.E.2d 182, 185 (1973). We have consistently held that "communication or intent to aid, if needed, does not have to be shown by express words of the defendant but may be inferred from his actions and from his relation to the actual perpetrators." *Sanders,* 288 N.C. at 291, 218 S.E.2d at 357. Moreover, presence alone may be regarded as an encouragement when the defendant " 'is a friend of the perpetrator[,] and knows that his presence will be

regarded by the perpetrator as an encouragement and protection.' " *State v. Haywood*, 295 N.C. 709, 719, 249 S.E.2d 429, 435 (1978) (quoting *State v. Holland*, 234 N.C. 354, 358, 67 S.E.2d 272, 275 (1951)).

In this case the evidence indicated that defendant was George Goode's brother and Eugene DeCastro's friend. Defendant was present when DeCastro began the assault on Mr. Batten and when George joined in the attack. When DeCastro left, leaving George alone fighting with Mr. Batten, defendant kicked Mr. Batten in order to aid his brother. Defendant remained nearby when DeCastro and George stabbed Batten to death. When Mrs. Batten arrived and DeCastro said that he had to "take her out too," defendant knew DeCastro meant that he would kill her. Defendant stood and watched DeCastro throw her down, beat her, and stab her to death. Defendant was only ten feet away. When DeCastro asked him to help move the bodies, defendant assisted. Defendant also helped clear the area of evidence, including Mr. Batten's dental plate. We conclude that this evidence was sufficient to support the friend exception to the mere-presence rule. Not only did defendant know that his presence would be taken as an encouragement and protection to George and DeCastro, his presence was in fact relied upon by both George and DeCastro when defendant provided them with active assistance and protection. We overrule defendant's assignment of error.

[11] In defendant's final assignment of error, he contends that the trial court erred by not individually polling all twelve members of the jury concerning their assent to each verdict. The record indicates that the following occurred:

> [THE COURT:] Ladies and gentlemen, what the court is going to do right now is poll you individually in regards to your verdict at the request of the defendant to insure that this is a unanimous verdict. The manner in which this will be done, as the court will do it, I will have each of you stand individually as I call your names. I'll indicate what you said in regards to your verdict in open court previously and ask if you still assent to or agree with that verdict individually.

The court individually polled the foreperson as to each verdict and then went back to juror number one and repeated the process. The record indicates in a parenthetical by the court reporter, "Upon motion by the defendant, the jury was polled in open court. Each juror answered that the verdict returned by the foreman was his or her verdict and each still assented thereto." The court then said,

STATE FARM MUT. AUTO. INS. CO. v. FORTIN

[350 N.C. 264 (1999)]

"Ladies and gentlemen, having polled the jury now, I'm going to ask that you step back into the jury deliberation room for just a moment. . . . The jury having been polled individually by—at the request of the defendant by the court, the court finds that this is a unanimous verdict of all jurors and is proper in all respects." Defendant did not object at any time to the manner of individual polling, but now maintains that the record is silent as to whether each juror assented to each verdict. We disagree with defendant that the record is silent; the record in fact reflects that each juror was individually polled and that each assented to the guilty verdicts. We overrule defendant's final assignment of error.

For the foregoing reasons we conclude that defendant received a fair trial free from prejudicial error.

NO ERROR.