IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-149

No. 521A20

Filed 17 December 2021

IN THE MATTER OF: C.B.C.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 26 May 2020 and 7 October 2020 by Judge Burford A. Cherry in District Court, Catawba County. On 27 January 2021, this Court allowed respondent's petition requesting expedited review of the 23 March 2020 and 5 November 2020 trial court orders that were pending review in the Court of Appeals and related to an underlying neglect proceeding. Additionally, this Court on its own motion consolidated the underlying neglect proceeding with the termination proceeding on direct appeal to this Court. Heard in the Supreme Court on 8 November 2021.

> *Lauren Vaughan for petitioner-appellee Catawba County Department of Social Services.*
>
> *Matthew D. Wunsche, GAL Appellate Counsel, for petitioner-appellee Guardian ad Litem.*
>
> *Robert W. Ewing for respondent-appellant mother.*

NEWBY, Chief Justice.

In this case we determine whether the trial court properly terminated respondent-mother's parental rights to C.B.C.B. (Charlie)[1] based upon N.C.G.S. § 7B-1111(a)(8) and thereafter ceased reunification with respondent. Because clear, cogent, and convincing evidence supports the trial court's termination order based on respondent's aiding and abetting second-degree murder, and because the trial court properly ceased reunification efforts in the underlying neglect action, the trial court's orders are affirmed.

On 15 August 2019, respondent gave birth to Charlie. DSS then received a report about Charlie based upon respondent's criminal record and her prior history with DSS involving her two older children, John and Kate. On 3 May 2013, John died after suffering severe abuse and neglect while in the care of respondent and her then-boyfriend, William Howard Lail. That same day, the Catawba County Department of Social Services (DSS) obtained nonsecure custody of Kate based upon respondent and Lail's neglect and abuse of Kate. On 1 October 2013, Kate was adjudicated an abused and neglected child based upon the following facts:

> 20. During the five or six months prior to May 3, 2013, [respondent] and William Lail repeatedly left the minor children [Kate] and [John] at home alone for hours at a time, leaving no one in the home to care for the children. On at least one of these occasions, they left the children asleep in their beds. On multiple other occasions, they left both children strapped in their car seats, at times in a

---

[1] Pseudonyms are used in this opinion to protect all juveniles' identities and for ease of reading.

closet, with no one to attend them for hours at a time. Later, when [Kate] learned how to free herself from her car seat, she was placed in a small closet with no light, where she was left for hours at a time. Mr. Lail and [respondent] would push a heavy object, such as a box of ammunition or a cupboard, in front of the door to prevent her from escaping, and would continue to leave [John] strapped in his car seat. On more than one occasion when Mr. Lail and [respondent] left the children at home alone, they went to a bar. On other occasions, the children were left alone for up to several hours when Mr. Lail's and [respondent's] work schedules overlapped.

21. In February or March, Mr. Lail was fired from his job. He did not work again after that. During this time, [respondent] left the children with Mr. Lail.

. . . .

24. Approximately seven to ten days prior to May 3, 2013, both [Kate] and [John] suffered extensive scalding injuries while in the sole care of William Lail. [Respondent] was at work when the injuries occurred. Although details of his explanations have changed, Mr. Lail has reported that he left the minor children in a bathtub for approximately four minutes with either the tub faucet or the shower head running while he took trash cans to the curb. He reported that while he was gone, the minor child [Kate] must have turned on the hot water, and he returned to find [Kate] standing outside the tub and [John] in the tub crying. The location and patterns of the burn injuries to these children is not consistent with the accidental explanation provided by Mr. Lail and are more consistent with intentional injury.

25. Despite the severe and extensive burns to the minor children, neither [respondent] nor William Lail sought or obtained any medical care for the minor children from the time the burns occurred through May 3, 2013. They attempted to use over-the-counter items to care for the

burns. The failure to obtain appropriate medical care for the children was a deliberate attempt to keep anyone from seeing the extensive injuries to the children and reporting them to the Department of Social Services.

26. During the time between the infliction of the scalding injuries to the children and May 3, 2013, Mr. Lail and [respondent] ensured that no one else saw the minor children. [Respondent] sent a text message to her parents to cancel a visit they had planned with the minor children. [Respondent] deliberately tried to keep her parents from seeing the children, so they would not make a report to the Department of Social Services.

27. During the seven to ten days after the children were scalded and before the death of [John] on May 3, 2013, [John's] behavior changed markedly. Although [John] had been an active and mobile child, he moved very little after being burned. He ate very little solid food during this period. Mr. Lail described that he basically would just lay [sic] there and "eat, sleep, and poop." Because diapers would irritate the extensive burns to [John's] buttocks, on multiple nights he was placed in a bathtub with a pillow, with no diaper or clothing, and no blanket, to sleep at night, so that he could urinate and defecate there in the tub.

28. On the morning of May 3, 2013, the day that the minor child [John] died, William Lail and [respondent] took the minor child [Kate] with them to McLeod Center to obtain methadone for Mr. Lail, to Bojangle's and to the grocery store for chocolate milk. The minor child [John] was left alone at home, where he lay on the love seat and moved very little. When they returned to the home between 8:00 and 9:00 a.m., Mr. Lail and/or [respondent] placed a biscuit next to [John] on the love seat, but he did not eat.

29. Later on the morning of May 3, 2013, around 10:10 a.m., William Lail and [respondent] left both [Kate] and [John] at home alone while Mr. Lail drove [respondent] to work. [Kate] was placed in a small closet with no light, and

a heavy box of ammunition was pushed in front of the door so that she could not get out. [John] was left lying on the love seat. [Respondent] has admitted, and the Court finds, that she was not concerned about leaving her nineteen month old child unattended and unrestrained because he could barely move in the aftermath of the burns he sustained seven to ten days earlier.

30. Still later on May 3, 2013, the same day [John] had been left at home alone twice and [Kate] had been left in the close[t] once, the Department received a third Child Protective Services report involving the minor child [Kate] on May 3, 2013 after EMS was called to the home of [respondent] and William Lail at 629 25th St. NW, Hickory, North Carolina and found the minor child [John], age nineteen months, had passed away. Law enforcement from Longview Police Department and the State Bureau of Investigation also responded to the home.

31. Mr. Lail's account of the events which occurred after he took [respondent] to work on May 3, 2013 and which led to the death of [John] changed over the course of several interviews. He was the sole caretaker for both of the minor children when the minor child [John] died. [Respondent] was at work when [John] died.

32. When law enforcement responded to the home on May 3, 2013, the body of [John] was at the home of a neighbor, where William Lail had gone for help and to call 9-1-1. The body of [John] had obvious injuries which included but were not limited to apparent burns and scabs to his forehead, back and buttocks and bruising to his forehead.

. . . .

35. An autopsy of [John] was conducted on May 4 and 6, 2013 by Dr. Jerri McLemore of North Carolina Baptist Hospital/Wake Forest University School of Medicine. The presumed cause of death for the minor child was determined to be drowning with significant contributory

factor of burns and blunt force injuries.

36. At the time of autopsy, [John] had large areas of scalding injuries to his forehead, predominantly to the front of the head, and extending to the back of the head as well as to the side of the head. The burns to the head were determined to be partial thickness burns, also known as second degree burns, and were in various stages of healing. Testing to the burns indicated that they were at least a couple of days old and could be approximately one week old.

37. In addition to the scalding injuries, a number of other injuries, including blunt force injuries, were found about the head of [John]. There were a number of bruises to [John's] head which were located in at least three different planes, indicating separate impacts to the child. These included a large dark bruise across the child's forehead as well as a patterned bruising and abrasion injury across the top of the child's head. A patterned injury is one which appears to have been inflicted by impact with a particular object. The patterned injury to the top and side of this child's head consisted of two parallel linear patterned combinations of bruises and abrasions which would be consistent with a belt.

38. Other injuries to the head and neck of the minor child [John], as documented during his autopsy, include but are not limited to bruising to the inside corner of his left eye and along the inside of his nose, bruising across the bridge of the child's nose, and a cut to the child's left eyelid. The locations of these specific bruises, as well as those to the top of the child's head are not consistent with typical accidental injuries to children of this age. There were additional bruises and injuries to the child's face, including but not limited to bruising to the outside of his left cheek, bruising to his right cheek, bruising near the left side of his mouth, and a scraping injury to the lip. The injuries to the child's face were in different planes, suggesting multiple impacts.

. . . .

47. The numerous bruises, abrasions, and scars, as well as the healing rib fracture are indicative of nonaccidental inflicted injury to this child, which occurred on multiple occasions. Many of the bruises, abrasions and scars would have been evident to his mother and caretaker for at least 24 hours prior to the child's death, with many of the injuries likely evident for longer.

. . . .

57. [Respondent] admitted that she has seen William Lail become increasingly aggressive over the last several months prior to [John's] death. She stated that she was afraid of Mr. Lail, wanted to leave him, and had spoken to friends about leaving him, but did not act on that. She has admitted that she has seen him hit the minor children with a double-looped belt, and specifically [Kate] on at least two occasions, and had seen him hit both children on their buttocks with an open hand. She has also admitted that she often came home from work to find bruises on her children for which Mr. Lail would offer excuses. Specifically on the morning of May 3, 2013, she saw unexplained linear bruising to [John's] back. Despite those injuries, she continued to leave her children in his care.

58. Despite the extensive scalding injuries to both children, received while in the sole care of William Lail, [respondent] continued to leave the minor children in his care while she worked.

59. [Respondent] has admitted that she saw the linear marks on [John's] back before she left him in William Lail's care on May 3, 2013.

60. Mr. Lail has stated that he took his lead on how to treat the minor children from the way that [respondent] treated the children. He asserts that [respondent] was very impatient with the children, would become angry and

scream at them and that she would place her hand over their mouths to stop them from crying. He has reported that [respondent] whipped the children with a belt, a coat hanger, a piece broken off of a mini blind and a wooden spoon.

. . . .

62. The Court specifically finds that both of the minor children have been struck on multiple occasions by Mr. Lail and/or [respondent] with objects including but not limited to a belt and a coat hanger.

63. The Court specifically finds that both of the minor children sustained inflicted bruising injuries after they received the scalding injuries outlined above.

. . . .

65. [Respondent] had opportunities to seek assistance and protection for herself and her children from Mr. Lail, if she was in fact in fear of him. She had experience with obtaining domestic violence protective orders and the services available to victims of domestic violence. She left the home regularly to go to work and had access to a phone to seek assistance from friends and family. Still, despite obvious severe injuries to her children, she took no measures to protect them and instead took active steps to conceal them and prevent them from being seen by those who might offer some measure of protection.

In July of 2013, respondent completed a psychological evaluation and was diagnosed with "Personality Disorder [Not Otherwise Specified] with Dependent features." Almost four years later, on 5 May 2017, respondent was convicted of one count of intentional child abuse inflicting serious physical injury and four counts of negligent child abuse inflicting serious physical injury, all stemming from John's

death and Kate's injuries. Respondent was released from prison in August of 2017. On 14 November 2017, William Lail was convicted of second-degree murder for John's death.

¶ 4 On 1 October 2019, DSS filed a petition alleging Charlie to be a neglected juvenile. Shortly thereafter, on 4 November 2019, the Guardian ad Litem (GAL) filed a petition to terminate respondent's parental rights to Charlie based upon N.C.G.S. § 7B-1111(a)(8). On 13 February 2020, the trial court entered an order consolidating the underlying neglect hearing filed by DSS with the termination of parental rights hearing filed by the GAL.

¶ 5 On 23 March 2020, the trial court entered an order of adjudication in which the court concluded that Charlie was a neglected juvenile. On 26 May 2020, the trial court entered an adjudication order on the motion for termination of parental rights, in which it found that:

> 8. Since [Charlie's] birth, during conversations with social workers and even during her testimony before this court, [respondent] has repeatedly minimized and excused her responsibility for the abuse and neglect suffered by her children [John] and [Kate]. When asked about her responsibility for the abuse and neglect, [respondent] focuses on herself as a victim of abuse and violence by Mr. Lail and tends to downplay or deny her own responsibility.
>
> 9. The Court has considered the severity of the abuse and neglect suffered by [Kate] and [John] which ultimately resulted in the death of [John], as well as the statements and testimony of the Respondent mother regarding her responsibility, or lack thereof, for the abuse and neglect of

her children. The Court has also considered the extensive and obvious nature of the injuries sustained by [John] prior to his death which were observable by the Respondent mother for a period of time during which she could have taken steps to protect her very young children. The Court finds that the Respondent mother had an affirmative duty to protect her very young minor children, particularly [John] whose injuries were more severe and which contributed to his death. The Court finds that the Respondent mother had an affirmative duty to take all steps reasonably possible to protect her minor children, and specifically [John], from an attack by William Lail and from the dangerous environment in which they were living with Mr. Lail.

10. [Respondent] intentionally failed to take [John] for medical care following his scalding burns, and such failure was a deliberate attempt on her part to hide [John's] injuries from professionals (DSS, doctors, etc.) who could have offered him help.

11. In the days prior to the death of [John], [respondent] sent text messages to her parents cancelling their planned visit with the children, in an effort to hide the children's injuries from them.

12. [Respondent] continued to leave her children in the sole care of William Lail, including on the day of [John's] death, even after observing their scalding injuries, patterned bruising on their bodies, and Lail's increasing aggression.

13. The Court finds that the Respondent mother, though not present in the home when [John] was killed, knew or should have known of the extreme risk posed by Mr. Lail and took no steps to prevent the injury of both children, [Kate] and [John]; and the death of [John]. The Court finds that the actions, omissions and decisions of the Respondent mother created the opportunity for Mr. Lail to commit the murder of [John] and were tantamount to consent to the conduct of Mr. Lail which resulted in the death of [John],

for which he was convicted of Second Degree Murder.

¶ 6    Thus, the trial court concluded that respondent had "aided, abetted, attempted, conspired or solicited to commit murder or voluntary manslaughter of another child of [respondent]: to-wit [John]." As such, the trial court determined that grounds existed to terminate respondent's parental rights to Charlie pursuant to N.C.G.S. § 7B-1111(a)(8). In a separate disposition order entered on 7 October 2020, the trial court concluded that terminating respondent's parental rights was in Charlie's best interests.

¶ 7    Thereafter, on 5 November 2020, the trial court entered a separate disposition order ceasing reunification with respondent in light of the court's previous order terminating her parental rights. Respondent appeals.[2]

¶ 8    A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence

---

[2] Respondent appealed to the North Carolina Court of Appeals the 23 March 2020 and 5 November 2020 orders of adjudication and disposition in the underlying neglect proceeding. Additionally, respondent appealed to the Supreme Court the 26 May 2020 and 7 October 2020 orders in the termination of parental rights proceeding. Because the two actions involve the same facts, respondent filed a petition for discretionary review with this Court, requesting that the appeal of the underlying neglect case bypass the Court of Appeals. On 27 January 2021, this Court allowed respondent's petition and, on its own motion, consolidated the underlying neglect proceeding and termination proceeding. Therefore, both matters are before this Court.

of one or more grounds for termination under section 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(f) (2019). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)).

¶ 9 Section 7B-1111 provides, in pertinent part, that "[t]he court may terminate the parental rights upon a finding . . . [that] [t]he parent has . . . aided, abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of the child, another child of the parent, or other child residing in the home." N.C.G.S. § 7B-1111(a)(8) (2019). Absent a prior conviction of a qualifying offense, the petitioner must "prov[e] the elements of the offense" to satisfy its burden to show that a parent's rights should be terminated under subsection 7B-1111(a)(8). *Id.*

¶ 10 Here, though respondent mother was convicted of both intentional and negligent child abuse, she was not convicted of second-degree murder. Therefore, the petitioner must prove the elements of either aiding and abetting, attempt, conspiracy, or solicitation of second-degree murder to satisfy its burden here.

¶ 11          Aiding and abetting occurs when (1) "the crime was committed by some other person;" (2) "the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime;" and (3) "the defendant's actions or statements caused or contributed to the commission of the crime by that other person." *State v. Goode*, 350 N.C. 247, 260, 512 S.E.2d 414, 422 (1999) (citation omitted).

¶ 12          With respect to the second element, "[t]he communication or intent to aid does not have to be shown by express words of the defendant but may be inferred from his actions and from his relation to the actual perpetrators." *Id.* at 260, 512 S.E.2d at 422. Generally an individual's failure to intervene does not make him guilty of aiding and abetting. *See State v. Walden*, 306 N.C. 466, 472, 293 S.E.2d 780, 784–85 (1982) (citing *State v. Birchfield*, 235 N.C. 410, 413, 70 S.E.2d 5, 7 (1952)). Parents, however, "have an affirmative legal duty to protect and provide for their minor children." *Id.* at 473, 293 S.E.2d at 785 (citations omitted). As such, parents must "take every step reasonably possible under the circumstances of a given situation to prevent harm to their children." *Id.* at 475, 293 S.E.2d at 786. Therefore, when a parent has actual knowledge of harm to his or her child and fails to reasonably protect the child from harm, that parent has knowingly aided the perpetrator's commission of the harm. *See*

*id.* at 473–76, 293 S.E.2d at 785. The reasonableness of a parent's response, however, must be determined on a case-by-case basis. *Id.* at 475–76, 293 S.E.2d at 786.[3]

¶ 13 Here the first element of aiding and abetting is clearly met because Lail was convicted of second-degree murder in the death of respondent's older son, John.

¶ 14 As for the second element, the trial court's order and the record support the finding that respondent "knowingly advised, instigated, encouraged, procured, or aided" Lail's murder of respondent's son, John. *Goode*, 350 N.C. at 260, 512 S.E.2d at 422. The trial court stated:

> The Court finds that the Respondent mother, though not present in the home when [John] was killed, knew or should have known of the extreme risk posed by Mr. Lail and took no steps to prevent the injury of both children, [Kate] and [John]; and the death of [John]. The Court finds that the actions, omissions and decisions of the Respondent mother created the opportunity for Mr. Lail to commit the murder of [John] and were tantamount to consent to the conduct of Mr. Lail which resulted in the death of [John], for which he was convicted of Second Degree Murder.

¶ 15 Because aiding and abetting requires knowledge, the trial court's statement that respondent "should have known" of the risk presented here is an inaccurate statement of the law and should be disregarded. Nevertheless, when read in context,

---

[3] Respondent argues that *Walden* is no longer authoritative given the legislature's enactment of N.C.G.S. § 14-5.2 (2019), which abolished all distinctions between accessories before the fact and principals to a crime. The statutory change, however, has no bearing on the general principle in *Walden* that parents may have a duty to intervene to protect their children.

the entire finding shows that the trial court concluded that respondent possessed the actual knowledge required to aid and abet Lail in murdering John. John's presumed cause of death was determined as "drowning with significant contributory factor of burns and blunt force injuries." Respondent's testimony at the trial court hearing and the findings from Kate's adjudication order, which are incorporated in the trial court's order here, consistently show that respondent knew that her children suffered severe abuse and saw the bruises and burns on John, yet intentionally concealed the injuries. Specifically, respondent had "seen William Lail become increasingly aggressive over the last several months prior to [John's] death," "had seen [Lail] hit the minor children with a double-looped belt," "had seen him hit both children on their buttocks with an open hand," "often came home from work to find bruises on her children," and, on the morning of John's death, "saw unexplained linear bruising to [John's] back." Rather than protecting John, respondent deliberately isolated John to conceal his injuries. This concealment was a significant contributory factor in John's death. Respondent refused to take John to the doctor and even cancelled a visit with her parents to avoid medical intervention or DSS involvement. Based upon respondent's conduct, the trial court found that respondent's "actions, omissions and decisions . . . created the opportunity for Mr. Lail to commit the murder of [John] and were tantamount to consent to the conduct of Mr. Lail which resulted in the death of [John]."

¶ 16    Moreover, the trial court found that respondent also took part in the abuse. She and Lail both struck John and Kate "with objects including but not limited to a belt and a coat hanger," and respondent was convicted of intentional and negligent child abuse. Respondent's actions demonstrate that she knew of harm to her children, participated in the abuse, and failed to reasonably protect John and Kate. As such, the trial court correctly determined that respondent knowingly aided Lail in committing second-degree murder.

¶ 17    As for the third element, respondent's actions contributed to Lail's murdering John. Had respondent reasonably protected her children or refrained from concealing John's injuries, Lail would not have had the opportunity to murder John. Instead of seeking help for John, however, respondent prioritized concealing John's injuries to protect herself. Respondent "continued to leave her children in the sole care of William Lail, including on the day of [John's] death, even after observing their scalding injuries, patterned bruising on their bodies, and Lail's increasing aggression." Respondent's actions, combined with all the facts recounted above, contributed to Lail's murder of John.

¶ 18     Because the elements of aiding and abetting are met in this case, the trial court appropriately terminated respondent's parental rights based upon N.C.G.S. § 7B-1111(a)(8).[4]

¶ 19     Respondent next argues that if this Court reverses the trial court's termination orders, the Court must also vacate the underlying neglect order ceasing her reunification with Charlie. Because we hold that the trial court did not err in terminating respondent's parental rights, however, we conclude that the trial court did not err in ceasing respondent's reunification with Charlie.

¶ 20     Thus, the trial court here properly terminated respondent's parental rights and ceased reunification efforts. Accordingly, the trial court's orders are affirmed.

AFFIRMED.

---

[4] Respondent also argues that the trial court erred in concluding that respondent solicited, conspired, or attempted to murder John. Because we have concluded that the trial court properly determined that respondent aided and abetted Lail in the murder of John, we need not reach these alternate grounds for terminating her rights under N.C.G.S. § 7B-1111(a)(8).

Justice ERVIN dissenting.

Although I agree with my colleagues that the record in this case provides more than sufficient support for a conclusion that respondent-mother aided and abetted Mr. Lail in murdering John, I am unable to join the Court's conclusion that the trial court's findings and conclusions, as written, suffice to permit an affirmance of the trial court's order. For that reason, rather than affirming the trial court's termination order on the basis set out in the Court's opinion, I would vacate the trial court's order and remand this case to District Court, Catawba County, for further proceedings, including the entry of a new order containing properly drafted findings of fact. As a result, I respectfully dissent.

As the parties to this case acknowledge, "[a] person is guilty of a crime by aiding and abetting if (i) the crime was committed by some other person; (ii) the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime; and (iii) the defendant's actions or statements caused or contributed to the commission of the crime by that other person." *State v. Goode*, 350 N.C. 247, 260 (1999); *see also State v. Dick*, 370 N.C. 305, 311 (2017). Although the necessary knowledge may be established by "circumstantial evidence from which an inference of knowledge might reasonably be drawn," *State v. Boone*, 310 N.C. 284, 294–95 (1984), *superseded on other grounds by statute, as recognized in State v. Oates*, 366 N.C. 264, 267 (2012), a person does not act "knowingly" in the event that, rather than having actual knowledge of the fact in question, he or she reasonably should

have had the required knowledge. *State v. Miller*, 212 N.C. 361, 363 (1937) (stating that "[k]nowledge connotes a more certain and definite mental attitude than reasonable belief," with the extent to which "knowledge [ ] implied from the circumstances [being] sufficient to establish reasonable belief [is] a question for the jury"), *superseded by statute in 1975 N.C. Sess. L. c 165, s. 1, as recognized in State v. Fearing*, 304 N.C. 471, 478 n.3 (1981). Thus, in order to find the existence of the ground for termination enunciated in N.C.G.S. § 7B-1111(a)(8) (allowing the termination of parental rights in the event that the parent "has . . . aided, abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of the child, another child of the parent, or other child residing in the home"), the trial court was required to find that respondent-mother had actual knowledge of the risk that Mr. Lail posed to John. As a result, the trial court erred by finding that respondent-mother's parental rights in Charlie were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(8) on an aiding and abetting theory based upon a finding that, although "not present in the home when [John] was killed, [she] knew or should have known of the extreme risk posed by Mr. Lail and took no steps to prevent the injury of both children."

¶ 23        Although my colleagues acknowledge that "the trial court's statements that [respondent-mother] 'should have known' of the risk presented here is an inaccurate statement of law and should be disregarded," they overlook this error on the grounds

that, "when read in context, the entire finding shows that the trial court concluded that respondent possessed the actual knowledge required to aid and abet [Mr. Lail] in murdering John." In reaching this conclusion, my colleagues point to the fact that John died as the result of drowning, that respondent-mother knew of the abuse that Mr. Lail had inflicted upon John while intentionally concealing the injuries that John had sustained, and that she had inflicted abuse upon both John and Kate. The Court has not, however, directed our attention to any direct or explicit statement by the trial court that respondent-mother had actual knowledge of the risks that Mr. Lail's conduct posed to John, with the remaining findings that the trial court actually made being consistent with both a view that respondent-mother actually knew of the relevant risks and a view that respondent-mother simply should have known of them. For that reason, I cannot conclude that the trial court did not decide that respondent-mother's parental rights in Charlie were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(8) on the basis of a misunderstanding of the applicable law. *Helms v. Rea*, 282 N.C. 610, 620 (1973) (stating that "[i]t is still the rule that '[f]acts found under misapprehension of the law will be set aside on the theory that the evidence should be considered in its true legal light' " (quoting *McGill v. Town of Lumberton*, 215 N.C. 752, 754 (1939))). In light of that determination, I am unable to see how the relevant portion of the trial court's order can withstand this aspect of respondent-mother's challenge to its legal validity.

¶ 24    I fully agree, on the other hand, that the record, including those portions upon which my colleagues rely, would have permitted the trial court to find the actual knowledge necessary to determine that respondent-mother's parental rights in Charlie were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(8) on the grounds that she aided and abetted Mr. Lail in murdering John. However, given the fact that the trial court never found the necessary actual knowledge and that this Court lacks the authority to make the required finding based upon an examination of a cold record, I cannot conclude that the trial court did not err in the course of determining that respondent-mother's parental rights in Charlie were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(8) on the grounds that respondent-mother aided and abetted Mr. Lail in murdering John. Hard cases, once again, seem to me to be making bad law.

¶ 25    The proper manner in which to rectify the trial court's error is readily apparent. Instead of affirming the challenged trial court order, I believe that we should vacate the trial court's termination order and remand this case to District Court, Catawba County, for the entry of a new order containing appropriate findings of fact and conclusions of law. In the event that my colleagues are correct in thinking that the inclusion of the trial court's reference to what respondent-mother "should have known" did not reflect what the trial court actually meant, then the trial court can quickly confirm that understanding by entering a new termination order that

finds the facts and makes legal conclusions on the basis of the existing record and a proper understanding of the applicable law. On the other hand, if the trial court did, in fact, mean to find that respondent-mother acted on the basis of something other than the required actual knowledge, it can take other appropriate action as well. In failing to act in this manner on the basis of the logic that the Court deems persuasive, we risk creating a precedent that allows this Court to draw inferences on appeal that the trial court did not, for whatever reason, draw, placing us in the position of a fact-finder despite the known limitations on the ability of appellate courts to act in that capacity.

My inability to join my colleagues in taking the analytical leap that they deem to be appropriate may seem excessively formalistic in light of the horrific facts that are before us in the case. I certainly understand the strength of the temptation to overlook the insufficiency of the trial court's findings in order to eliminate any conceivable risk that Charlie would be returned to respondent-mother's care. In other words, "[t]he very sordidness of the evidence strongly tempts us to say that justice and law are not always synonymous [ ] and to vote for an affirmance of the judgment . . . on the theory that justice has triumphed, however much law may have suffered." *State v. Bridges*, 231 N.C. 163, 166 (1949) (Ervin, J., dissenting). Although "[i]t might well be that [a remand for additional findings] would result" in the entry of another order terminating respondent-mother's parental rights in Charlie pursuant to

N.C.G.S. § 7B-1111(a)(8) on the basis of the theory that she aided and abetted Mr. Lail's homicidal conduct, "[t]hat possibility should not shape our action" given that "what happens to the law in this case is of the gravest moment," that our decision to make a finding concerning the critical issue of knowledge "will be invoked in other [ ] trials as a guiding and binding precedent," and that "[t]he preservation unimpaired of our basic rules of [ ] procedure is an end far more desirable than that of" ensuring that this case comes to an end now. *Id.* at 171. As a result, while "[c]andor compels the confession that it is not altogether easy to hearken to" respondent-mother's arguments in this matter, *id.* at 166, I would, rather than affirming the trial court's order with respect to the issue of whether respondent-mother's parental rights in Charlie are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(8) on the basis of an aiding and abetting theory, vacate the trial court's order and remand this case to District Court, Catawba County, for further proceedings not inconsistent with this opinion, including the entry of a new order containing findings of fact and conclusions of law that are based upon a proper understanding of the applicable law.[1]

Justice EARLS joins in this dissenting opinion.

---

[1] As my colleagues have noted, the trial court also found that respondent-mother's parental rights in Charlie were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(8) on the basis of a determination that respondent-mother solicited, conspired, or attempted to murder John. In view of the fact that the Court has not addressed the validity of the trial court's findings and conclusions with respect to any of those legal theories, I will refrain from addressing them as well.