An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1315

Filed: 15 September 2015

Orange County, Nos. 08 CRS 932-33, 09 CRS 513

STATE OF NORTH CAROLINA

v.

BRANDON HAMILTON GREEN, Defendant.

Appeal by defendant from judgments entered 2 June 2014 by Judge R. Allen Baddour in Orange County Superior Court. Heard in the Court of Appeals 7 May 2015.

>*Attorney General Roy Cooper, by Special Deputy Attorney General Sonya Calloway-Durham, for the State.*
>
>*Cheshire Parker Schneider & Bryan, PLLC, by John Keating Wiles, for defendant-appellant.*

GEER, Judge.

Defendant Brandon Hamilton Green appeals from judgments entered on his convictions of first degree murder under the felony murder rule and conspiracy to commit first degree kidnapping. The trial court arrested judgment on the first degree kidnapping offense. On appeal, defendant primarily argues that there was insufficient evidence to support a jury instruction on aiding and abetting first degree kidnapping. The State presented evidence that defendant placed the phone call to

his friend instructing him to bring the victim to a garage, that defendant brandished a gun while the victim was interrogated about being a snitch, and that defendant was present while the victim was physically bound and transported to the woods where he was ultimately murdered. We hold that this is sufficient evidence that defendant aided in and encouraged the commission of the kidnapping of the victim.

Facts

The State's evidence tended to show the following facts. Brian Minton, Jacob Maxwell, Jack Johnson, Garry Bright, Matt Johnson, Joshua Bailey, Sarah Krombach, and Chelsea Lipsom were a group of friends and acquaintances who knew each other from having grown up in Chapel Hill, North Carolina. In the summer of 2008, they were all between the ages of 18 and 22. Matt and Joshua were the newest members of the group.

Defendant, who was 26 at the time, met Garry Bright in the early part of the summer when he attended a party at Garry's house on Sourwood Circle in Chapel Hill with defendant's younger brother, Jazz Mitchell. Shortly thereafter, defendant started dating Garry's mother, Martha Bright, and moved into the house at Sourwood Circle. About a month later, defendant married Martha. That summer, seven people were living at Sourwood Circle: Garry; his mother Martha; his grandmother Lou Lou Bright; Garry's cousin Ryan Lee, aged 21; Jack Johnson; defendant; and defendant's brother Jazz. Joshua Bailey would also sometimes reside in a tent in Garry's yard.

Several of these young men and women were engaged in illegal activities. Brian, Jack, Jacob, Matt, and Joshua were involved in selling marijuana. Earlier that summer, Brian, Jack, and Jacob had broken into Brian's old house and stolen a TV and sound system. In July 2008, Brian, Jack, Garry, Jacob, Chelsea, and Matt committed a home invasion and armed robbery in Greensboro, North Carolina. Chelsea knocked on the door while Jack and Jacob stood on each side of the door with a nine millimeter handgun and a .38 caliber handgun. When the occupants answered the door, Jack and Jacob forced their way inside and demanded drugs and cash. They stole marijuana, a Playstation, an iPod, and some money.

Sourwood Circle was used as a "stash house" for stolen items. Sourwood Circle was also used as a location for drinking, smoking marijuana, taking pills, and doing cocaine. While defendant was not involved in any of the robberies, he was aware that illegal activities were taking place, and he smoked marijuana and did cocaine at Sourwood Circle.

The morning of 29 July 2008, Brian, Jacob, Jack, Garry, Chelsea, and Sarah were hanging out in the garage at Brian's parents' house in Chapel Hill. Sarah, who had been dating Matt on and off during the summer, told the rest of the group that Matt had been informing the police about their crimes and about illegal activities taking place at Sourwood Circle. Sarah also accused Matt of stealing items from her dad's house. Jack realized that he was missing some marijuana and the iPod that he

had stolen during the Greensboro robbery, and Brian believed that some pills and expensive sunglasses were missing from his house. They suspected that Matt was the culprit, and Brian decided that they should bring Matt over to the garage to interrogate him to find out where the stolen items were and how to get them back.

Matt was at Sourwood Circle with defendant at the time. Brian and Jack drove Brian's mother's SUV to Sourwood Circle to pick up Matt, and defendant decided to come along as well. When they got to the garage, they sat Matt down and began to interrogate him about the stolen items. At one point, Brian pulled out a .38 revolver and gave it to defendant who continued to interrogate Matt. Defendant's questioning focused mainly on whether Matt had informed the police about the illegal activities taking place at Sourwood Circle. Later on during the interrogation, Brian pulled out a nine millimeter gun. Matt denied everything and eventually implicated Joshua as the person who had talked to the police and who had stolen the missing items. They decided to bring Joshua into the garage for questioning.

At that time, Joshua and Ryan were still at Sourwood Circle. Defendant called Ryan and instructed him to bring Joshua to Brian's garage and to park his car around back. When Ryan and Joshua arrived, Brian closed the garage bay door and locked the side door. Garry immediately jumped on Joshua and began hitting and punching him. Defendant and Jack pulled Garry off of Joshua and then the others began questioning him. While questioning Joshua, Chelsea smacked him, Jack punched

him in the lip, and Jacob hit him in the lower back. Joshua denied that he was a snitch and stated that he saw Matt steal items from Sarah and accused Matt of working for the police. During the interrogation, Sarah heard defendant say, "We will not tolerate snitches or narcs." Brian also made several threats including stating that "[s]omebody is going to take a long ride to the country[,]" and that he was going to shoot someone.

Eventually, Brian came up with the idea that Matt and Joshua should fight it out to determine who was the snitch. Brian, Jacob, and defendant consulted with one another and decided that there would be a time limit to the fight. Matt and Joshua "kind of wrestled around for a minute or two," but Joshua did not fight back. Defendant kept the time on his cell phone and began tapping the .38 revolver on the table to signal the countdown to the end of the fight.

After the fight, Brian stated he was "ready to handle the situation." Brian ordered Jack and Jacob to tie Joshua's hands together. Jacob zip-tied Joshua's wrists, and Jack duct-taped them together. Around one o'clock that afternoon, everyone exited the garage. Sarah, Garry, and Chelsea left to go to lunch. Joshua was ordered into the back of Brian's SUV. Jacob and Matt sat on either side of Joshua; Jack sat in the passenger seat; and Brian drove. Defendant and Ryan followed in Ryan's car.

They drove to Jacob's parents' house located on a cul de sac on Twisted Oaks Drive in Chapel Hill. Brian informed Jack that "they were going to take Josh into

the woods and Matt was going to shoot him." Jacob led the group down a small, heavily wooded path into the woods. They stopped at a dried up creek bed with a large uprooted tree in a clearing. At that time, Matt had possession of the nine millimeter and Brian had the .38 revolver. Jack, Jacob, and Matt carried shovels.

Upon orders from Brian, they attempted to dig a hole, but the ground was too hard. Brian ordered Joshua to stand in the ditch made by the uprooted tree. Joshua's hands and wrists remained bound, but the duct tape around his head and mouth had been taken down so that he could talk. Joshua was standing in the depression face-to-face with Matt, and the others were standing in a circle behind Matt. Defendant and Ryan were standing in the circle behind Jack. At one point, Jacob pointed a gun at Joshua, but Brian stopped him and told him to "let Matt do it since he was the snitch." Brian gave the order for Matt to shoot Joshua. Matt shot Joshua from two feet away, and Joshua collapsed and fell backward. Brian then ordered Matt to shoot Joshua again, and Matt complied. After the second shot, Joshua was dead. Joshua's last words before he died were, "Guys, I didn't do it."

Brian gave orders to bury the body, and Jack, Jacob, and Brian began shoveling dirt on top of Joshua's body. Jack testified that defendant "started giving instructions and telling people, 'hurry up' . . . 'Somebody might have heard gunshots. Be quick. Be quick.' " Ten to 15 minutes after they arrived at Jacob's house, they returned to their vehicles and drove back to Brian's house.

The next evening, defendant asked Ryan to give him a ride to pick up his friend "Seez." Ryan, defendant, and Seez then went to Brian's garage where Brian sold Seez the black handgun that was used to kill Joshua. Brian received $150.00, and defendant received drugs from the sale. During the negotiations, Brian explained that the gun was "dirty," meaning that it "had been used to shoot somebody."

A week or two after Joshua's murder, Brian, Jack, Jacob, and their friend Chris Manley removed Joshua's body and reburied it in Chatham County near Jordan Lake. Joshua's remains were not found until 13 September 2008.

Defendant was indicted for first degree murder, first degree kidnapping, and conspiracy to commit murder and kidnapping. At trial, defendant did not present any evidence. The jury returned verdicts of guilty of conspiracy to commit first degree kidnapping, guilty of first degree kidnapping on the basis that it was done for the purpose of terrorizing the victim, and guilty of first degree murder under the felony murder rule. The trial court arrested judgment on the first degree kidnapping offense and sentenced defendant to life imprisonment without parole for first degree murder, and to a term of 77 to 102 months imprisonment for the conspiracy offense, to be served consecutively. Defendant timely appealed to this Court.

I

On appeal, defendant first argues that the trial court erred by instructing the jury on both acting in concert and aiding and abetting for the kidnapping charge.

Defendant does not contest the sufficiency of the evidence to support the acting in concert instruction, but argues only that there was insufficient evidence to support an aiding and abetting instruction.

"In examining the sufficiency of the evidence supporting a jury instruction on appellate review, '[a]ll evidence actually admitted, both competent and incompetent, which is favorable to the State must be considered.' . . . '[T]he evidence must be considered by the court in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn from the evidence.' " *State v. Grullon*, ___ N.C. App. ___, ___, 770 S.E.2d 379, 381 (quoting *State v. Woodard,* 324 N.C. 227, 230, 376 S.E.2d 753, 754-55, 755 (1989)), *disc. review denied*, ___ N.C. ___, 777 S.E.2d 732 (2015). We review jury instructions de novo. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).

Our Supreme Court has held that " '[t]he distinction between aiding and abetting and acting in concert . . . is of little significance[,]' " and the trial court may instruct on both theories. *State v. Davis*, 301 N.C. 394, 398, 271 S.E.2d 263, 265 (1980) (quoting *State v. Williams*, 299 N.C. 652, 656, 263 S.E.2d 774, 777 (1980)). *See also State v. Roache*, 358 N.C. 243, 312, 595 S.E.2d 381, 425 (2004) (rejecting defendant's argument that theories of aiding and abetting and acting in concert are mutually exclusive).

In order to support an instruction on acting in concert, the State must present evidence tending to show "(1) that defendant was present at the scene of the crime, and (2) that he acted together with another who did acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime." *State v. Robinson*, 83 N.C. App. 146, 148, 349 S.E.2d 317, 319 (1986).  On the other hand, "[a] person is guilty of a crime by aiding and abetting if (i) the crime was committed by some other person; (ii) the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime; and (iii) the defendant's actions or statements caused or contributed to the commission of the crime by that other person." *State v. Goode*, 350 N.C. 247, 260, 512 S.E.2d 414, 422 (1999).

As explained in *Goode*:

> A person is not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission; to be guilty he must aid or actively encourage the person committing the crime or in some way communicate to this person his intention to assist in its commission.  The communication or intent to aid does not have to be shown by express words of the defendant but may be inferred from his actions and from his relation to the actual perpetrators. Furthermore, when the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement.

*Id.* (internal citations omitted).

In this case, the trial court instructed the jury on both acting in concert and aiding and abetting the first degree kidnapping of Joshua Bailey. "The offense of kidnapping is established upon proof of an unlawful, nonconsensual restraint, confinement, or removal of a person from one place to another, for the purpose of . . . terrorizing or doing serious bodily harm to the person." *State v. Morgan*, 183 N.C. App. 160, 166, 645 S.E.2d 93, 99 (2007); N.C. Gen. Stat. § 14-39(a)(3) (2013).

Defendant argues that there is insufficient evidence that defendant " 'knowingly advised, instigated, encouraged, procured, or aided' " in the kidnapping of Joshua because defendant did not duct tape or restrain Joshua and he did not order Joshua to get into the SUV. Defendant's argument is based in part upon the mistaken assumption that the kidnapping did not begin until Joshua's wrists were tied together and he was ordered into the SUV. However, "the plain wording of G.S. 14-39(a) authorizes a kidnapping conviction whenever the defendant has committed at least *one* of the underlying acts of either confinement, restraint or removal for a proscribed purpose." *State v. Easter*, 51 N.C. App. 190, 195, 275 S.E.2d 861, 864 (1981).

" 'Confinement' in the context of the offense 'connotes some form of imprisonment within a given area, such as a room, a house or a vehicle.' . . . Whereas ' "restrain," [sic] while broad enough to include a restriction upon freedom of movement by confinement, connotes also such a restriction, by force, threat or fraud, without confinement.' " *State v. Shue*, 163 N.C. App. 58, 63, 592 S.E.2d 233, 237

(2004) (quoting *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978)). " '[T]he requisite restraint need not be accomplished solely by physical force. It may also be accomplished by trickery or by fraudulent representations amounting substantially to a coercion of the will of the victim.' " *State v. Robertson*, 149 N.C. App. 563, 566, 562 S.E.2d 551, 554 (2002) (quoting *State v. Harris*, 140 N.C. App. 208, 213, 535 S.E.2d 614, 618 (2000)).

A reasonable jury could find that Joshua's kidnapping began long before his wrists were physically tied together. The evidence shows that defendant aided in tricking Joshua to come to the garage and in confining Joshua to the garage once he arrived. Defendant called Ryan and told him to bring Joshua to Brian's garage. He was present when Joshua arrived at the garage and Brian closed the garage bay door and the side door. While Joshua was interrogated and beaten, defendant brandished a handgun. He also stated that "[w]e will not tolerate snitches or narcs." Defendant "consulted" with Brian and others while they beat and interrogated Joshua, and agreed with Brian that Joshua and Matt should fight each other. Defendant timed the fight and tapped his revolver to signal the time. He went outside with Brian to "get the truck ready" while Jack and Jacob zip-tied and duct taped Joshua's hands. Defendant's brandishing of a weapon not only aided the others in confining Joshua to the garage, *see State v. Yarborough*, 198 N.C. App. 22, 26, 679 S.E.2d 397, 402 (2009) (holding evidence that two people entered victim's trailer, one stood in the doorway

while other brandished a loaded shotgun and ordered victim to get down, even if victim did not comply with order, sufficient to show that victim was "confined" within meaning of N.C. Gen. Stat. § 14-39(a)(2)), it also aided the others in carrying out the purpose of the confinement -- terrorizing Joshua.

Furthermore, defendant was not merely present throughout the entire kidnapping. When he called Ryan and instructed him to bring Joshua to the garage, he communicated to the others his intent to go along with their plan to interrogate Joshua. Defendant's brandishing of a weapon and keeping time with his watch while Joshua and Matt fought aided the others in confining Joshua's freedom of movement and terrorizing him. These actions, along with his statement that "[w]e will not tolerate snitches or narcs" encouraged the others and communicated to them an intent to aid in the commission of the kidnapping. Finally, even though defendant did not physically restrain Joshua or order him to get into the SUV, he continued to communicate a willingness to aid in the commission of the crime by accompanying Joshua and the others from Brian's garage to the location where Joshua was ultimately shot and killed. *See Easter*, 51 N.C. App. at 196, 275 S.E.2d at 865 ("We believe that defendant's actual presence throughout this entire criminal episode, from its beginning to its end, established the necessary elements for his conviction for aiding and abetting the kidnapping. His continual presence indicated his intent to render assistance, if it became necessary at any stage of the plot, and also effectively

communicated his willingness to aid [the kidnapper]. We also hold that, viewed in the light most favorable to the State, the evidence of defendant's presence during the removal of the confined victim (by itself) provided an adequate basis for the jury to infer his intent to aid in the kidnapping."). Accordingly, we hold that the trial court did not err by instructing the jury on both acting in concert and aiding and abetting.

## II

Defendant next argues that the trial court erred in denying his request for an instruction regarding the mere presence doctrine to the conspiracy charge. "It is well settled that 'if a request be made for a special instruction, which is correct in itself and supported by evidence, the court must give the instruction at least in substance.'" *State v. Mewborn*, 178 N.C. App. 281, 292, 631 S.E.2d 224, 231 (2006) (quoting *State v. Lamb*, 321 N.C. 633, 644, 365 S.E.2d 600, 605-06 (1988)).

> "A jury charge will be sufficient if it presents the law of the case in such a manner as to leave no reasonable cause to believe the jury was misled or misinformed. Refusal of a requested charge is not error where the instructions fairly represent the issues. The decision whether to give jury instructions is within the trial court's sound discretion, and will not be overturned absent an abuse of discretion."

*State v. Mason*, 222 N.C. App. 223, 231, 730 S.E.2d 795, 801 (2012) (quoting *Osetek v. Jeremiah*, 174 N.C. App. 438, 440, 621 S.E.2d 202, 204 (2005), *aff'd per curiam*, 360 N.C. 471, 628 S.E.2d 760 (2006)).

At the charge conference, defendant requested that the trial court instruct the jury with respect to the conspiracy charge, as it did on the kidnapping and murder charges, that "[a] person is not guilty of a crime merely because he is present at the scene, even though he may silently approve of the crime or secretly intend to assist in its commission." The trial court declined defendant's request and concluded that the conspiracy instruction was sufficient by itself to inform the jury that defendant's mere presence was insufficient to convict defendant of conspiracy. The trial court instructed the jury as follows:

> For you to find the defendant guilty of [conspiracy], the State must prove three things beyond a reasonable doubt: First, that the defendant and Brian Minton, Jack Johnson, Matt Johnson, Ryan Lee, or Jacob Maxwell entered into an agreement. The State need not prove an express agreement. Evidence tending to show a mutual implied understanding will suffice. This evidence may be circumstantial or inferred from the defendant's behavior; second, that the agreement was to commit first degree kidnapping or first degree murder as have been previously defined for you; and third, that the defendant and Brian Minton, Jack Johnson, Matt Johnson, Ryan Lee, or Jacob Maxwell intended that the agreement be carried out at the time it was made.

We agree with the trial court that the conspiracy instruction sufficiently informed the jury that defendant's mere presence at the scene of the kidnapping was insufficient to convict him of conspiracy to commit the kidnapping. The instruction that the jury was required to find, at the very least, that defendant had a "mutual implied understanding" with at least one co-conspirator, necessarily requires a

finding beyond defendant's mere presence at the scene. We hold that this instruction accurately presents the law to the jury and fairly represents the issues. *See State v. Shelly*, 176 N.C. App. 575, 586, 627 S.E.2d 287, 296 (2006) (defining criminal conspiracy consistent with trial court's instructions).

We note that *State v. Merrill*, 138 N.C. App. 215, 530 S.E.2d 608 (2000), cited by defendant, does not address the mere presence doctrine. In *Merrill*, this Court reversed the defendant's conviction for conspiracy to commit murder where the evidence failed to show that she entered an agreement with her alleged co-conspirator. The evidence in *Merrill* showed that the alleged co-conspirator had suggested killing the victim but received no response from the defendant. *Id.* at 220, 530 S.E.2d at 612. The defendant had, a few weeks prior to the murder, expressed a desire that the victim be dead, but there was no evidence presented that the defendant provided any assistance in the furtherance of the murder, and, in fact, she was out of town at the time of the murder. *Id.* at 221-22, 530 S.E.2d at 612-13. After the murder, the defendant had assisted in concealing the crime. *Id.* at 221, 530 S.E.2d at 612. This Court held that "[m]ere passive cognizance of the crime or acquiescence in the conduct of others will not suffice to establish a conspiracy. The conspirator must share the 'purpose of committing [the] felony.' . . . It is not sufficient that the actor only believe that the result would be produced, but did not consciously

plan or desire to produce it." *Id.* (quoting Model Penal Code § 5.03 cmt. (2)(c)(I), at 407 (1962)).

Although defendant correctly points out that neither mere passive cognizance of the crime nor mere presence at the scene of the crime are sufficient to show a conspiracy, he has nevertheless failed to show that the instruction, which requires the jury to find that defendant entered into an agreement, misled the jury.

NO ERROR.

Judges ELMORE and DILLON concur.

Report per Rule 30(e).