IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-677

Filed 3 December 2025

Cleveland County, Nos. 21CR052309-220, 21CR052310-220, 21CR052312-220, 21CR052314-220; 22CR000004-220, 22CR000005-220

STATE OF NORTH CAROLINA

v.

JAMIE T. KLEIST and KALA D. LIPSCOMB, Defendants.

Appeal by defendants from judgments entered 3 August 2023 by Judge Todd Pomeroy in Superior Court, Cleveland County. Heard in the Court of Appeals 20 May 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Megan Shook, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Heidi Reiner, for defendant-appellant Lipscomb.*

> *Christopher J. Heaney for defendant-appellant Kleist.*

STROUD, Judge.

Defendants Jamie T. Kleist (Kleist) and Kala D. Lipscomb (Lipscomb) (collectively, Defendants) were convicted on multiple charges related to Kleist's sexual acts on Lipscomb's two children. A jury found Kleist guilty of one count of statutory rape and two counts of statutory sexual offense with a child by an adult. It

found Lipscomb guilty of aiding and abetting those crimes and two separate counts of felony child abuse by sexual act.  Both Defendants appeal.

Lipscomb challenges the sufficiency of the evidence supporting her convictions and the jury instructions. Both Defendants challenge the admission of expert testimony.  We hold that the trial court erred in denying Lipscomb's motion to dismiss her aiding and abetting convictions and one count of felony child abuse.  The trial court did not err in admitting the expert testimony or denying Lipscomb's motion to dismiss the other felony child abuse count.

## I.    Background

In December 2020, Lipscomb lived with her boyfriend Kleist and her two children, Val and Luke,[1] in a camper in King's Mountain, North Carolina.  Val was seven years old; Luke was nine.

Near the end of December, Lipscomb called her cousin Billy Byers in Tennessee and asked him to "come and get her and the camper."  Billy went to King's Mountain, but on arrival, he saw that the camper was "not movable" and "non-livable."  It was "falling apart," had windows "busted out," "looked like it had mold in it," and lacked running water.  And as for the children, Billy found Val and Luke "very thin" with "shaved heads."  Luke's shoes were also too small.

Billy brought Lipscomb and the children back to his Tennessee home, where

---

[1] We use pseudonyms to protect the minor children's identities.

they stayed for about a week. Bridget Byers, Billy's wife, noticed that the children appeared "very underweight" and "were constantly wanting to eat." Lipscomb told Bridget that the children's heads were shaved because they had lice. During their stay, neither child mentioned "anything . . . about any type of sexual activity."

Around New Year's Day, Lipscomb asked Bridget to drive her and the children to a trailer park in the next county. Bridget dropped them at a trailer home and helped them unload their belongings onto the porch. No one seemed to be home. Soon after, the Byerses asked Billy's mother—Lipscomb's aunt—to contact Lipscomb about keeping the children for the weekend to go to church. Lipscomb agreed and dropped the children off at her aunt's.

Without telling Lipscomb, Bridget contacted the children's biological father, Leon Lipscomb, in Alabama. She testified that she was concerned about the children's welfare. The next day, Leon came to Tennessee, filed a petition for temporary custody, and took Val and Luke to Alabama.

One to two weeks later, Luke told Leon that Kleist had threatened him with waterboarding-style torture. Kleist said, according to Leon's testimony, that he would "tie[ ] [Luke] to a chair," place "a towel . . . over his face," "lean[ ] [him] back," and pour water over him. Both children "expressed fear" that Lipscomb and Kleist would "find them and take them back." Leon consequently contacted Child Protective Services (CPS) in Alabama.

On 15 January 2021, Jill Hansel from CPS interviewed Luke and Val. Eleven

days later, the children participated in forensic interviews at Brooks Place Child Advocacy Center. During these interviews, the children disclosed both sexual and physical abuse Kleist had committed against them. Luke described Kleist forcefully pulling him from the top bunk and throwing him against the door. And Val reported that Kleist had "sexual[ly] abuse[d]" her.

Hansel testified that Luke appeared "nervous" and "uncomfortable" during his interview. He slid off the couch and began crawling on the floor when asked about living with Defendants. Val's demeanor similarly changed when discussing that period: "Her tone of voice changed. She began to look down, kind of curling inward. She was sliding off the couch. She changed to three different positions in the room." In her forensic interview, Val stated that "she didn't tell" Lipscomb "what was happening" with Kleist. She instead asserted that Kleist had "told [Lipscomb] what had happened," and, in response, Lipscomb had "cussed him out."

On 24 February 2021, sexual assault nurse examiner Liana Hill performed forensic examinations of both children. Hill, who the State proffered as an expert in forensic sexual assault examinations, testified that the children's physical examinations were "normal" but confirmed this "neither concludes nor rules out sexual assault." Her medical reports[2] included this statement, which Hill read to the jury: "Given the overwhelming fact that the majority of children [who] disclose sexual

---

[2] These reports were admitted as State's Exhibits 18 and 19.

abuse have normal genital exams, the absence of injury on the examination in no way lessens any concern[ ] for sexual abuse."

In March 2021, a King's Mountain criminal investigator received the Alabama CPS report "alleging sexual abuse." Investigators located Defendants at a Tennessee motel. Both were later indicted on multiple charges arising from child sexual abuse. Their cases were joined for trial in July 2023.

Trial began on 31 July 2023, in Superior Court, Cleveland County. Luke and Val testified about Kleist's actions. In particular, Luke testified that Kleist forced him to touch Kleist's penis, performed oral sex on him, and anally penetrated him. Each assault occurred once. Though Luke never disclosed the abuse to Lipscomb, he believed that she knew.

Val testified that Kleist inserted his penis into her vagina and anus, inserted his finger and a red bottle into her anus, forced her to perform oral sex on him, and performed oral sex on her. Kleist had also put his "front private part" in her mouth and "made [her] drink" the "white stuff" that came out. Kleist warned her not to "tell anybody or else," which Val understood to mean that "if [she] told anybody, [she] would get hurt."

Unlike her forensic interview, Val did not testify that Kleist told Lipscomb about the abuse. Asked if Lipscomb ever saw what Kleist did, Val said "No." And asked if Lipscomb knew, Val responded, "After a little while, yes"—because Val had "told her what [Kleist] had been doing to [her]." But Val could not remember what

she said to Lipscomb, the words she used, or how Lipscomb responded. Still, Val testified that Kleist continued abusing her "very often" after she informed Lipscomb.

Neither Defendant testified or presented evidence. The jury found Kleist guilty of one count of statutory rape of a child by an adult and two counts of statutory sexual offense with a child by an adult. It also found Lipscomb guilty of two counts of felony child abuse by sexual act, one count of aiding and abetting statutory rape, and two counts of aiding and abetting statutory sexual offense with a child by an adult. Both Defendants gave oral notice of appeal.

## II. Discussion

On appeal, Lipscomb raises four arguments, and Kleist raises one argument that Lipscomb incorporates by reference.

First, Lipscomb argues that the trial court erred by denying her motion to dismiss. She contends that the State presented insufficient evidence that she had the requisite intent for aiding and abetting under North Carolina General Statutes Sections 14-27.23(a) and 14-27.28(a) or that she feloniously "allow[ed] the commission of any sexual act" on her children under North Carolina General Statute Section 14-318.4(a2). Second, she claims that the court committed plain error in failing to instruct the jury that it could convict her only if it found that she aided specific, identified criminal acts with actual knowledge of those particular crimes and the requisite intent to facilitate them. Third, she challenges her sentences as "violat[ing] federal and state constitutional proportionality provisions."

Both Defendants argue that the trial court committed plain error in admitting Hill's testimony that the absence of physical injuries "should in no way lessen any concern[ ] for sexual abuse."

We hold that the trial court erred in denying Lipscomb's motion to dismiss her aiding and abetting convictions and one count of felony child abuse as to Luke. The State failed to present substantial evidence of the conduct and mental state required for aiding and abetting. The State also failed to prove that Lipscomb knew Kleist had committed sexual acts on Luke, and without knowledge, she could not have "allow[ed]" those acts under Section 14-318.4(a2). The State showed, however, that Lipscomb knew Kleist had committed sexual acts on Val and took no action to prevent further acts, so the trial court did not err in denying the motion to dismiss the felony child abuse charge as to Val. This holding makes it unnecessary to address Lipscomb's remaining arguments. We also hold that the trial court did not commit plain error in admitting Hill's testimony.

## A. Lipscomb's Motion to Dismiss

We start with Lipscomb's convictions for one count of statutory rape by aiding and abetting under Section 14-27.23(a) and two counts of statutory sexual offense with a child by an adult by aiding and abetting under Section 14-27.28(a). We then turn to her conviction for two counts of felony child abuse by sexual act under Section 14-318.4(a2).

This Court reviews the denial of a motion to dismiss to determine whether

"substantial evidence" (1) supports "each essential element of the crime" and (2) shows "that the defendant is the perpetrator." *State v. Golder*, 374 N.C. 238, 249, 839 S.E.2d 782, 790 (2020) (quoting *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824, 826 (2015)). Substantial evidence is the "amount . . . necessary to persuade a rational juror to accept a conclusion." *Id.* We view the evidence "in the light most favorable to the State," giving it "every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* "[W]hether the State presented substantial evidence of each essential element of the offense is a question of law," which we review *de novo*. *Id.* (quoting *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018)).

### 1. *Aiding and Abetting Under Sections 14-27.23(a) and 14-27.28(a)*

Section 14-27.23(a) provides that a "person is guilty of statutory rape of a child by an adult if the person is at least 18 years" old and has "vaginal intercourse with a . . . child under the age of 13 years." N.C. Gen. Stat. § 14-27.23(a) (2023). Section 14-27.28(a) states a "person is guilty of statutory sexual offense with a child by an adult if the person is at least 18 years" old and "engages in a sexual act with a . . . child under the age of 13 years." N.C. Gen. Stat. § 14-27.28(a) (2023).

Lipscomb argues that the State failed to prove that she "knowingly assisted, cooperated, or encouraged Kleist in specifically intended instances of rape and statutory sex offenses against" her children. She notes that the evidence shows she was absent, asleep, or incapacitated during Kleist's acts. She neither participated in nor encouraged Kleist's conduct and learned of it only shortly before leaving with

Billy and her children. Without "knowing, intentional conduct such as 'assistance, promotion, encouragement, or instigation of criminal actions,' " Lipscomb contends, there's no aiding and abetting. She also asserts that the State failed to identify which specific acts she allegedly aided.

The State responds that the evidence, viewed in the light most favorable to it, establishes each essential element of the charged offenses. Lipscomb, according to the State, "knew or should have known that Kleist was sexually abusing her children." The State cites *State v. Walden*, 306 N.C. 466, 293 S.E.2d 780 (1982), arguing that parents have a "special duty" to protect their children. Under *Walden*, "a parent who is present" and fails "to take all steps reasonably possible to protect" her "child from an attack by another person constitutes an act of omission by the parent showing" her "consent and contribution to the crime being committed." *Id.* at 476, 293 S.E.2d at 787.

The State claims that "[s]ubstantial evidence exists" that Lipscomb (1) "knew Kleist had sexually assaulted Val," (2) failed "to protect her children," and (3) allowed the abuse to continue "very often." So in its view, the trial court properly denied Lipscomb's motion to dismiss. We disagree.

A defendant aids and abets a crime when the State proves: (1) another person committed the crime; (2) the defendant "knowingly advised, instigated, encouraged, procured, or aided" that person "to commit th[e] crime"; and (3) the defendant's "actions or statements caused or contributed" to the crime's commission. *State v.*

*Melvin*, 364 N.C. 589, 592, 707 S.E.2d 629, 632 (2010) (quoting *State v. Goode*, 350 N.C. 247, 260, 512 S.E.2d 414, 422 (1999)).

Lipscomb does not dispute that Kleist committed these crimes. So we focus on element two, which contains both a conduct requirement—the defendant must have "advised, instigated, encouraged, procured, or aided" the perpetrator—and a mental state requirement—she must have done so "knowingly." *Id.* On both fronts, the State's evidence falls short.

*a. Conduct Requirement*

The conduct requirement demands some form of assistance, encouragement, or other supportive behavior by the defendant. *State v. Bowman*, 188 N.C. App. 635, 648, 656 S.E.2d 638, 648 (2008). The defendant must "aid[ ] or actively encourage[ ] the person committing the crime or in some way communicate[ ] . . . h[er] intention to assist in its commission." *Goode*, 350 N.C. at 260, 512 S.E.2d at 422 (citation omitted). And when a defendant "does not actually participate" in the crime, the State must show she "by word or deed, gave active encouragement to the perpetrator" or communicated that she was "standing by to lend assistance when and if it should become necessary." *State v. Gaines*, 260 N.C. 228, 231-32, 132 S.E.2d 485, 487 (1963) (citations omitted). Courts may infer this communication from the defendant's "actions" and her "relation to the actual perpetrators." *Goode*, 350 N.C. at 260, 512 S.E.2d at 422 (citing *State v. Sanders*, 288 N.C. 285, 291, 218 S.E.2d 352, 357 (1975)).

Here, the State presented no such evidence. Val testified that Kleist committed his acts when Lipscomb was "gone," in "the bathroom," at "the laundromat," or "[a]sleep." Luke testified that "[s]ometimes [Lipscomb] was [awake] and sometimes she was asleep." But neither he nor anyone else indicated that Lipscomb actively encouraged Kleist or communicated her intent to assist him.

This evidence does not satisfy the conduct requirement. Someone who is absent or unconscious cannot "active[ly] encourage[ ]" the perpetrator or communicate that she is "standing by to lend assistance . . . when and if it become[s] necessary." *Gaines*, 260 N.C. at 232, 132 S.E.2d at 487 (citations omitted). And someone who is merely present—even if awake—cannot satisfy these requirements without some evidence she witnessed the acts, communicated encouragement, or otherwise signaled her intent to assist. Luke's testimony that Lipscomb was "[s]ometimes" awake when the abuse occurred does not cure this deficiency. There was no evidence she saw the acts or took any action to encourage them. Physical presence in the same home, without more, is not enough.[3]

The State's closing argument confirms the gap in its evidence. Presumably presenting its best argument based on the evidence, the State asserted that Lipscomb "provided access to the children," "kept them in [Kleist's] presence," and "was present

---

[3] Some of the evidence actually suggests the opposite of encouragement: Val testified that when Kleist supposedly told Lipscomb about his actions, Lipscomb "cussed him out." This reflects opposition, not assistance, even if this form of opposition was woefully inadequate to protect the children from future harm.

in the home when those acts occurred." But again, the State presented no evidence that Lipscomb was present *and* aware while Kleist engaged in any sexual act with Val. As for Luke, the State presented no evidence that Lipscomb encouraged Kleist, assisted him, or communicated her intent to do so. The State proved only that Lipscomb lived with Kleist and the children and failed to provide even minimal basic care for them. But maintaining a household with a partner, without more, is not aiding and abetting. *Goode*, 350 N.C. at 260, 512 S.E.2d at 422 ("A person is not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission[.]" (citation omitted)).

Substantial evidence does not support the conduct requirement.

*b. Mental-State Requirement*

The mental state requirement demands that the defendant (1) know that "the perpetrator was committing a crime" and (2) intend "to facilitate the perpetrator's unlawful purpose." *Bowman*, 188 N.C. App. at 648, 656 S.E.2d at 648 (citation omitted). The State must show that the defendant had the "subjective knowledge" that her actions would "aid[ ] a criminal act." *Id*. at 649, 656 S.E.2d at 649 (emphasis omitted).

The State argues that the "sum of the evidence" shows that Lipscomb "was aware that Val had been sexually abused by Kleist." It points to Val's forensic interview, where she said that Kleist told Lipscomb himself, prompting Lipscomb to

"cuss[ ] him out." The State also relies on Val's trial testimony, where she gave a different account, testifying that she had personally told Lipscomb.

We assume, taking Val's statements as true and viewing them in the light most favorable to the State, that Lipscomb learned of Kleist's abuse at some point—either from Val or Kleist—and that Kleist continued abusing Val after Lipscomb gained this knowledge. *State v. Miles*, 222 N.C. App. 593, 599, 730 S.E.2d 816, 822 (2012) (noting that in "review[ing] the trial court's denial of a motion to dismiss," this Court "resolv[es] any contradictions or discrepancies in the State's favor" (citations omitted)). Even so, the State presented no evidence of affirmative conduct by Lipscomb actively encouraging or communicating his intent to help Kleist commit these offenses against Val. *See Gaines*, 260 N.C. at 231-32, 132 S.E.2d at 487 (citations omitted).

As for Luke, the State's evidence is even weaker. Neither Luke nor Val claimed that Lipscomb knew about Luke's abuse at all. Luke testified:

> [Kleist's Counsel:] You said that after it happened, you never told . . . Lipscomb about it?
>
> [Luke:] Yes.
>
> [Kleist's Counsel:] All right. And you said that you did not tell . . . Lipscomb about it because she was asleep; is that right?
>
> [Luke:] Yes.

The State therefore failed to show that Lipscomb knew that Kleist "was committing

a crime" against Luke. *Bowman*, 188 N.C. App. at 648, 656 S.E.2d at 649.

Still, the State suggests that Lipscomb "could easily have heard or seen Kleist abusing her children" because "one could see from one end of the camper to the other." Accepting the State's assumption that Lipscomb "could easily have heard or seen" Kleist's actions requires not reasonable deduction but "pure surmise." *State v. Ham*, 238 N.C. 94, 98, 76 S.E.2d 346, 349 (1953); *see also State v. Evans*, 279 N.C. 447, 453, 183 S.E.2d 540, 544 (1971) ("If . . . the evidence i[s] sufficient only to raise a suspicion or conjecture as to whether the offense charged was committed, the motion [to dismiss] should be allowed even though the suspicion so aroused by the evidence is strong."). Without evidence of actual knowledge, the State cannot prove that Lipscomb knew Kleist was committing a crime against Luke.

Even assuming the State presented substantial evidence that Lipscomb knew Kleist had committed the charged crimes against Val and Luke, it failed to show that Lipscomb "inten[ded] to facilitate" those crimes. *Bowman*, 188 N.C. App. at 648, 656 S.E.2d at 648 (citation omitted). The State's theory (again) rests on the inference that because Lipscomb lived with Kleist and the children, she must have intended any resulting "access" to facilitate his acts. But this conflates ordinary domestic arrangements with criminal intent. "A person is not guilty of a crime merely because [s]he is present at the scene"—even if she "silently approve[s] of the crime" or "secretly intend[s] to assist in its commission." *Goode*, 350 N.C. at 260, 512 S.E.2d at 422 (citation omitted).

The State also invokes parents' "special duty to [their] children." Parents have "an affirmative legal duty to protect and provide for their minor children." *Walden*, 306 N.C. at 473, 293 S.E.2d at 785 (citations omitted). When a parent knows her child faces danger, she must "aid the child if reasonably possible." *Id.* If that parent "is present" and fails "to take all steps reasonably possible to protect [her] child from an attack," that failure "constitutes an act of omission . . . showing the parent's consent and contribution to the crime being committed." *Id.* at 476, 293 S.E.2d at 787.

The State cites three cases applying this principle for support: (1) *Walden*; (2) *State v. Noffsinger*, 137 N.C. App. 418, 528 S.E.2d 605 (2000); and (3) *State v. Ainsworth*, 109 N.C. App. 136, 426 S.E.2d 410 (1993). None help. These cases all involved parents who were present during the abuse, witnessed it, and failed to intervene.

In *Walden*, the mother "looked on the entire time" her boyfriend was beating her child and "did not say anything or do anything to stop the . . . beating." 306 N.C. at 469, 293 S.E.2d at 783. The Court limited its focus to scenarios in which the parent "*was present* when her child was assaulted but failed to take reasonable steps to prevent the assault." *Id.* at 468, 293 S.E.2d at 782 (emphasis added). In *Noffsinger*, the defendant admitted (four times) that she "was present when . . . the child's injuries occurred." 137 N.C. App. at 426, 528 S.E.2d at 611. This Court explained that "a parent has a duty to take affirmative action to protect her child and may be

held criminally liable *if she is present* when someone harms her child and she does not take reasonable steps to prevent it." *Id.* at 426, 528 S.E.2d at 611 (emphasis added). And in *Ainsworth*, the mother watched "her twelve[-]year[-]old child [engage] in intercourse with an adult" and "did not take any reasonable steps to prevent this intercourse." 109 N.C. App. at 143, 426 S.E.2d at 415.

In each case, the parent was present during the abuse, witnessed it, and failed to intervene. But here, the State never proved that Lipscomb was present during Kleist's acts or witnessed them. Val testified that Kleist acted when Lipscomb was "gone"—at the laundromat, in the bathroom, or asleep. Luke testified that "[s]ometimes [Lipscomb] was [awake] and sometimes she was asleep" but never that she witnessed anything and then failed to intervene.

And even if the parental "special duty" doctrine could apply here, the State forfeited any reliance on it. It did not develop this theory at trial[4] or request a "special duty" instruction, and the trial court did not give one. "[T]he State did not advance th[is] argument[ ]" below, so it is "waived" and "not properly before this Court." *State v. Romano*, 369 N.C. 678, 693, 800 S.E.2d 644, 654 (2017) (citation omitted); *see also State v. Quick*, 226 N.C. App. 541, 543, 739 S.E.2d 608, 610-11 (2013) (declining to address the State's argument when "it was not raised at the trial court hearing"). Beyond that, the jury in *Walden* received explicit instructions on this parental

---

[4] The State mentioned this theory only once—while the jury was out during argument on Lipscomb's motion to dismiss—when it stated that Lipscomb "ha[d] an affirmative duty to protect her children."

"special duty" theory. *Walden*, 306 N.C. at 471, 293 S.E.2d at 784. Not so here. The State cannot now rely on this doctrine to sustain Lipscomb's conviction.

Finally, the State claims that Lipscomb "should have known that Kleist was sexually abusing her children." But "should have known" is not enough. *In re C.B.C.B.* makes this clear. 379 N.C. 392, 866 S.E.2d 434 (2021). There, our Supreme Court examined whether a mother had aided and abetted her boyfriend's murder of her son. *Id.* The trial court found that the mother "knew or should have known of the extreme risk" her boyfriend posed. *Id.* at 403, 866 S.E.2d at 442. The Supreme Court acknowledged this finding showed actual knowledge when "read in context," but rejected the "should have known" language as "an inaccurate statement of law." *Id.* at 404, 866 S.E.2d at 442. A parent, the Court explained, "has knowingly aided the perpetrator's commission of the harm," when that parent "has actual knowledge of harm to his or her child and fails to reasonably protect that child from harm." *Id.* at 403, 866 S.E.2d at 442 (citing *Walden*, 306 N.C. at 473-76, 293 S.E.2d at 785).

Substantial evidence does not support the mental-state requirement.

In short, the State failed to present substantial evidence that Lipscomb aided and abetted Kleist in committing statutory rape under Section 14-27.23(a) or statutory sexual offense with a child under Section 14-27.28(a). We vacate those convictions.

### 2. *Felony Child Abuse Under Section 14-318.4(a2)*

We now turn to Lipscomb's conviction for two counts of felony child abuse under North Carolina General Statute Section 14-318.4(a2). That provision states: "Any parent or legal guardian of a child less than 16 years of age who commits or allows the commission of any sexual act upon the child is guilty of a Class D felony." N.C. Gen. Stat. § 14-318.4(a2) (2023).

According to North Carolina Pattern Jury Instruction 239.55B—which the trial court gave here—a person is guilty under Section 14-318.4(a2) if (1) she's a "parent or legal guardian of [the] child"; (2) her child is "less than 16 years" old; and (3) she "commits or allows the commission of any sexual act" on her child. N.C.P.I.– Crim. 239.55B. Lipscomb does not contest the first two elements, so we proceed to the third.

Element three has two components. First, "commits or allows the commission of"—in legalese, the actus reus, or "[t]he wrongful deed that comprises the physical components of [the] crime." *State v. Barnes*, 229 N.C. App. 556, 563, 747 S.E.2d 912, 918 (2013) (citation omitted). Second, "any sexual act." Section 14-318.4(a2) does not define "sexual act," nor is it defined elsewhere in the subchapter. Here, the trial court instructed the jury that a sexual act may include "fellatio"; "anal intercourse"; and "an immoral, improper, or indecent touching or act by . . . Kleist upon the child or inducement by . . . Kleist of an immoral or indecent touching by the child for the purpose of arousing or gratifying sexual desire." No one disputes that instruction.

Lipscomb instead challenges the meaning of "allows" in Section 14-318.4(a2). She contends that "allows" is "equivalent to aiding and abetting" and that the State "failed to present substantial evidence that [she] allowed Kleist to rape and sexually assault her children." The State counters in conclusory fashion that the evidence satisfies the statute and was "sufficient to deny [Lipscomb's] motion to dismiss."

This is an issue of first impression. Subsection (a2) was added to Section 14-418.4 in 1983 and remains substantially unchanged. *Compare* An Act Entitled the Child Protection Act of 1983, ch. 916, § 1, 1983 N.C. Sess. Laws 1265 *with* N.C. Gen. Stat. § 14-318.3(a2) (2023). Despite its four decades on the books, no published decision has addressed what "allows" means under this provision.[5]

Our "principal goal" in "statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001). "The best indicia of [legislative intent is] the language of the statute" itself. *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). We thus "begin with an examination of the relevant statutory language." *Wilkie v.*

---

[5] Lipscomb points to one unpublished case from this Court addressing "allows" under Section 14-318.4(a2): *State v. Hunter*, 2002 N.C. App. LEXIS 2333, No. COA01-1126, at *1 (Aug. 6, 2002) (unpublished). *Hunter*, however, did not engage with Section 14-318.4(a2)'s text. Instead, it relied primarily on the parents' "duty to protect and provide for their minor children." *See id.* at *13-14 (citing *State v. Walden*, 306 N.C. 466, 473, 293 S.E.2d 780, 785 (1982)). Without examining what "allows" means, *Hunter* held that the trial court did not err in denying a motion to dismiss where "[t]he sum of the evidence indicate[d] [that the] defendant was aware, or should reasonably have been aware, that her daughters were in danger of molestation." *Id.* at *19. But statutory interpretation "must begin with an examination of the relevant statutory language." *N.C. Dep't of Revenue v. Philip Morris USA, Inc.*, __ N.C. ___, ___,919 S.E.2d 175, 180 (2025) (citation omitted). We are not bound by our unpublished decisions and decline to follow *Hunter*'s approach. N.C. R. App. P. 30(e).

*City of Boiling Spring Lakes*, 370 N.C. 540, 547, 809 S.E.2d 853, 858 (2018). And when this language "is clear and . . . [un]ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms." *State v. Watterson*, 198 N.C. App. 500, 505, 679 S.E.2d 897, 900 (2009).

We first address Lipscomb's argument that "allows" is "equivalent to aiding and abetting." These terms have different meanings. As noted above, to "aid and abet" means that the defendant "knowingly advised, instigated, encouraged, procured, or aided" another person "to commit th[e] crime" and the defendant's "actions or statements caused or contributed" to the crime's commission. *Melvin*, 364 N.C. at 592, 707 S.E.2d at 632 (quoting *Goode*, 350 N.C. at 260, 512 S.E.2d at 422). Someone who advises, instigates, encourages, procures, or aids another in committing a crime no doubt "allows" that crime to happen. But aiding and abetting requires some sort of affirmative action promoting or encouraging the crime's commission. The term "allow," by contrast, covers a *failure* to act when the defendant should act.

We now examine the plain meaning of "allows." Courts "consult dictionaries for the purpose of determining the plain meaning of statutory terms." *State v. Fletcher*, 370 N.C. 313, 327, 807 S.E.2d 528, 538 (2017). The most common definition of "allows" is "[t]o let do or happen; permit." *Allow*, The American Heritage Dictionary (2d ed. 1982). The dictionary states that "allow" "implies refraining from any hindrance," while "permit" suggests "authoritative consent." *Id.* Put differently: to allow something is to refrain from stopping it. *See* Bryan A. Garner, *Garner's*

*Modern English Usage* 39 (4th ed. 2016) (noting that "[a]llow suggests merely the absence of opposition").

Two points follow from this definition. First, one cannot "allow" what one does not know about. To "let" something happen requires awareness it is happening. *Allow*, The American Heritage Dictionary (2d ed. 1982). Second, one cannot allow what one lacks the capacity to prevent. As the dictionary put it, "[i]nherent in . . . [allow] is capacity to prevent an act." *Id.* So to "allow[ ] the commission of any sexual act" on a child, a parent must have reason to believe another person will sexually abuse the child, be in the position to stop it, and fail to take any action to protect the child. N.C. Gen. Stat. § 14-318.4(a2).

But one question remains: when does a parent "allow" ongoing abuse? Must she witness each specific act as it occurs? Or does learning about past abuse create a duty to prevent future abuse? The plain meaning supplies the answer. If a parent knows sexual abuse has occurred and may continue, and she does nothing to stop it, she is "let[ting it] . . . happen"—she is "refraining from any hindrance." *Allow*, The American Heritage Dictionary (2d ed. 1982). That is what "allow" means.

The statutory context confirms this reading. "[W]ords in a statute are not construed in isolation[.]" *State v. Hill*, 291 N.C. App. 633, 640, 896 S.E.2d 216, 222 (2023); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) (imploring judges "to consider the entire text, in view of its structure and of the physical and logical relation of its many parts"). Section 14-

318.4(a2) creates two distinct offenses: "commit[ting] *or* allow[ing] the commission of any sexual act upon [a] child." N.C. Gen. Stat. § 14-318.4(a2) (emphasis added); *see also* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* at 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."). "Commits" covers the parent who perpetrates the sexual act herself. "Allows" must mean something different, or it would be surplusage. *State v. Coffey*, 336 N.C. 412, 417, 444 S.E.2d 431, 434 (1994) ("[A] statute should not be interpreted in a manner which would render any of its words superfluous." (citation omitted)).

What "allows" covers, then, is a parent who knows someone has committed sexual acts on the child in the past or has engaged in a course of conduct of sexual acts on the child yet does nothing to prevent future abuse. If "allows" required physical presence during each act, the statute would fail to reach conduct squarely within its scope: a parent who learns sexual acts have occurred or may occur and does nothing to prevent further acts. Such a parent has knowledge. She has the capacity to intervene. And she is "let[ting] [it] happen" by doing nothing. *Allow*, The American Heritage Dictionary (2d ed. 1982). But under a presence requirement, she would escape liability simply because she was not physically present when the acts occurred. The legislature could not have intended this absurd result. *See State ex rel. Comm'r of Ins. v. N.C. Auto. Rate Admin. Off.*, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978) ("In construing statutes courts normally adopt an interpretation which will avoid absurd

or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results.").

A parent thus "allows the commission of any sexual act" under Section 14-318.4(a2) when she: (1) has actual knowledge that a sexual act on her child has occurred or is occurring; (2) has the capacity to prevent further sexual acts; and (3) fails to take reasonable action to protect her child, thereby letting such acts continue. Physical presence during each act is not required. What matters is knowledge and failure to intervene.

Here, viewing the evidence in the light most favorable to the State, substantial evidence supports Lipscomb's Section 14-318.4(a2) conviction regarding Val. *See Miles*, 222 N.C. App. at 599, 730 S.E.2d at 822 (citations omitted).

Val testified that she told Lipscomb about Kleist's conduct. This shows that Lipscomb had actual knowledge Kleist had committed sexual acts on her daughter. Val also testified that the acts happened "very often" *after* she told Lipscomb. The jury could therefore reasonably infer that Kleist's sexual acts continued after Lipscomb learned about them.

Lipscomb also had the capacity to prevent further sexual abuse. When she learned of the sexual abuse, she could have removed Val from Kleist's presence, reported the conduct to authorities, or sought help from family members immediately. The record contains no evidence suggesting that she lacked the ability or means to intervene.

Finally, there was no evidence that Lipscomb took any action to protect Val after learning of Kleist's sexual acts. She did not report to authorities, remove Val from the home, or otherwise intervene. By "refraining from any hindrance," *Allow*, The American Heritage Dictionary (2d ed. 1982), despite knowing sexual acts had occurred and having the capacity to prevent further acts, Lipscomb "allow[ed] the commission of [a] sexual act" on Val under Section 14-318.4(a2). N.C. Gen. Stat. § 14-318.4(a2).

Lipscomb nonetheless insists that she could not have "allowed" sexual acts that occurred in her absence or while she was asleep. This argument succeeded as to her aiding and abetting convictions under Sections 14-27.23(a) and 14-27.28(a) because "aiding and abetting" differs from "allow[ing]." Section 14-318.4(a2) does not require Lipscomb to personally witness the abuse or be physically present during each act. The phrase "[a]llows the commission of any sexual act" encompasses permitting ongoing conduct by continuing to grant Kleist unsupervised access to Val in the same place and circumstances where Kleist had previously abused her. Once Lipscomb knew Kleist had committed sexual acts on Val, the law required her to prevent further abuse. Whether later incidents occurred in her presence or absence, while she was awake or asleep, makes no difference. By doing nothing after gaining knowledge, she allowed Kleist's conduct to continue.

The trial court did not err in denying Lipscomb's motion to dismiss the felony child abuse charge as to Val.

But the evidence as to Luke differs critically. The State presented no substantial evidence that Lipscomb "allow[ed]" any sexual acts on Luke because it failed to prove that she knew Kleist had committed them. Neither Luke nor Val testified that Lipscomb knew about the sexual acts on Luke. Luke testified that he never told Lipscomb what happened:

> [Kleist's Counsel:] You said that after it happened, you never told . . . Lipscomb about it?
>
> [Luke:] Yes.
>
> [Kleist's Counsel:] All right. And you said that you did not tell . . . Lipscomb about it because she was asleep; is that right?
>
> [Luke:] Yes.

One cannot "allow" what one does not know about. Again, the plain meaning of "allow"—"to let do or happen; permit"—requires awareness of the conduct being permitted. *Allow*, The American Heritage Dictionary (2d ed. 1982). Without knowledge, there can be no allowing.

Still, the State claims that Lipscomb "could easily have heard or seen Kleist abusing her children" because "one could see from one end of the camper to the other." But speculation cannot substitute for evidence of actual knowledge. "If . . . the evidence i[s] sufficient only to raise a suspicion or conjecture as to whether the offense charged was committed, the motion [to dismiss] should be allowed even though the suspicion so aroused by the evidence is strong." *Evans*, 279 N.C. at 453, 183 S.E.2d

at 544.  To infer that Lipscomb knew about the sexual acts on Luke based solely on the camper's layout—despite Luke's testimony that Lipscomb was asleep and he never told her—requires "pure surmise."  *Ham*, 238 N.C. at 98, 76 S.E.2d at 349.

Without evidence that Lipscomb knew Kleist committed sexual acts on Luke, she could not have "allow[ed]" them under Section 14-318.4(a2).  We vacate her conviction on that count.

In sum, the trial court did not err in denying Lipscomb's motion to dismiss the felony child abuse charge as to Val.  It did, however, err in denying her motion to dismiss the felony child abuse charge as to Luke.  We thus vacate that conviction.

## B.  Expert Testimony

Kleist and Lipscomb[6] argue that the trial court committed plain error by admitting Hill's testimony that "the absence of physical injuries 'should in no way lessen any concern[ ] for sexual abuse.' "  Hill stated in both her report and testimony, that "[g]iven the overwhelming fact that the majority of children who disclose sexual abuse have normal genital examinations, the absence of injuries on the examination should in no way lessen any concern[ ] for sexual abuse."  Defendants maintain that this testimony "invaded the jury's province by telling the jurors" how to weigh the evidence about "a lack of physical injuries."  We disagree.

To preserve an issue for appellate review, a party must generally "raise the

---

[6] Lipscomb incorporates by reference Kleist's plain error arguments.  N.C. R. App. P. 28(f).

issue and secure a ruling from the trial court." *State v. Reber*, 386 N.C. 153, 157, 900 S.E.2d 781, 785 (2024) (citing N.C. R. App. P. 10(a)(1)). For evidentiary challenges, "this typically requires the party challenging the evidence . . . to make a timely objection." *Id.* Without an objection, the party "waive[s] the right to raise the alleged error on appeal." *State v. Lawrence*, 365 N.C. 506, 512, 723 S.E.2d 326, 330 (2012) (citing *State v. Oliver*, 309 N.C. 326, 334, 307 S.E.2d 304, 311 (1983)). Because Defendants failed to object, we review only for plain error. *Id.*

Plain error review "exists for the rare cases where the harshness of this preservation rule vastly outweighs its benefits." *Reber*, 386 N.C. at 158, 900 S.E.2d at 786 (citation omitted). Defendants must show: (1) "a fundamental error occurred at trial"; (2) "absent the error, the jury probably would have returned a different verdict"; and (3) this is an "exceptional case" warranting plain error review. *Id.*

We begin with the first requirement. Defendants argue that Hill's testimony violated *State v. Stancil*, 355 N.C. 266, 559 S.E.2d 788 (2002) (per curiam) and its progeny by improperly vouching for the children's credibility. They invoke the general rule that one witness cannot "vouch for the veracity of another witness." *State v. Robinson*, 355 N.C. 320, 335, 561 S.E.2d 245, 255 (2002). This rule exists because "the truthfulness of a particular witness should be determined by the jury rather than by a witness for one party or the other." *State v. Caballero*, 383 N.C. 464, 475, 880 S.E.2d 661, 669 (2022). So by letting one witness vouch for another's credibility, Defendants contend, the trial court improperly prevented jurors from

"drawing [their] own conclusions from the evidence." *State v. White*, 154 N.C. App. 598, 605, 572 S.E.2d 825, 831 (2002). Because (1) there "is precedent for holding that testimony affecting a witness's credibility is plain error," and (2) this error "infringed so clearly on the jury's fact-finding role," Defendants insist that this alleged error was "fundamental and exceptional."

Our Supreme Court applied these vouching principles in *Stancil*, 355 N.C. at 266, 559 S.E.2d at 788. There, after a "thorough examination and a series of tests revealed no physical evidence of sexual abuse," the trial court still allowed a pediatrician to testify that the victim was "sexually assaulted" and suffered from emotional, physical, and sexual "maltreatment." *Id.* at 267, 559 S.E.2d at 789. The pediatrician based her opinion on "two examinations of the child and her review of" a psychologist's "in-depth interview with the child." *Id.* The Court held that "[i]n a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred." *Id.* at 266, 559 S.E.2d at 789. "[A]bsent physical evidence supporting a diagnosis of sexual abuse," the Court explained, "such testimony is impermissible opinion regarding the victim's credibility." *Id.* at 266-67, 559 S.E.2d at 789. Yet *Stancil* made clear that "an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." *Id.* at 267, 559 S.E.2d at 789.

Hill's testimony fell squarely within *Stancil*'s boundaries. Unlike the

pediatrician in *Stancil* who testified that sexual abuse had "*in fact* occurred," Hill never opined that either Val or Luke was actually abused. *Id.* at 266, 559 S.E.2d at 789. She confirmed only that the absence of injuries "neither concludes nor rules out sexual assault." This statement only told the jury that normal physical findings do not definitively prove or disprove abuse.

Hill also laid a proper scientific foundation for her testimony. She testified about her extensive qualifications: For instance, Hill stated that she had conducted nearly 2,500 forensic examinations and was the forensic nurse program director for "Protective Services." The trial court accepted her as an expert in "the field of forensic sexual assault examinations." She then explained the medical science: children's bodies "can heal quickly after a genital injury," making the absence of injuries medically inconclusive. This scientific explanation distinguishes this case from situations where experts offer bare conclusions without a medical basis. *See State v. Davis*, 265 N.C. App. 512, 517, 828 S.E.2d 570, 574 (2019) (finding error where the nurse's testimony "was not based on any science or other medical knowledge she may have possessed").

Defendants, however, raise two specific objections to Hill's phrasing. First, Defendants object to Hill's use of "overwhelming fact" to describe how commonly sexual abuse victims have normal physical examinations. They think this told "the jurors how much weight to give" the absence of physical evidence. But this merely describes a statistical reality Hill indicated was based on her "training and

experience" and "medical literature." This differs markedly from an opinion about whether these particular children were abused.

Second, Defendants challenge Hill's statement that the absence of physical injuries "should in no way lessen any concern[ ] for sexual abuse." They argue that this improperly "presumed that there was a 'concern for sexual abuse' " in the first place and told jurors how to weigh the absence of physical evidence. In their view, this language crossed the "line carefully drawn" in *Davis*, 265 N.C. App. at 512, 828 S.E.2d at 570, and *Stancil* because it did more than say "an absence of physical injury is consistent with sexual abuse"—which they concede "is permissible."

But Hill's statement did not improperly tell jurors how to weigh the evidence. Read in context, Hill was explaining that normal physical findings are medically inconclusive: they neither prove nor disprove abuse. The phrase "should in no way lessen any concern" instructs jurors not to draw the false inference that normal physical findings rule out abuse. *Davis* found this type of expert testimony permissible—testimony clarifying "that the lack of physical evidence does not necessarily rule out that sexual abuse may have occurred" and "might aid the trier of fact to understand that the lack of physical evidence does not necessarily mean that the defendant is not guilty." *Id.* at 517, 828 S.E.2d at 574. Hill's testimony did the same; it made clear that normal examinations "neither conclude nor rule out" abuse.

Importantly, Hill never commented on the children's credibility or truthfulness. She examined Val and Luke and found normal physical examinations.

Her testimony addressed only what those normal findings medically signify—nothing more.

The cases Defendants cite are distinguishable. In *State v. Towe*, the victim's exam revealed no physical findings of sexual abuse. 366 N.C. 56, 60, 732 S.E.2d 564, 566 (2012). Still, the expert testified that the victim was "in the category" of 70-75% of sexually abused children who show no abnormal findings. *Id.* at 60, 732 S.E.2d at 567. This effectively told the jury that the victim had been abused despite no physical evidence. The Court thought this improper because "the only bases for [the expert's] conclusory assertion that the victim had been sexually abused were the victim's history" and statements from others—"evidence that, standing alone, [wa]s insufficient to support an expert opinion that a child was sexually abused." *Id.* at 62, 732 S.E.2d at 568. Here, Hill did not categorically label the children as abuse victims; she simply clarified what physical findings can and cannot medically establish.

In *State v. Frady*, the expert testified that the victim's "disclosure was consistent with sexual abuse." 228 N.C. App. 682, 685, 747 S.E.2d 164, 167 (2013). But the "alleged 'disclosure' " was the victim's "description of the abuse." *Id.* at 685, 747 S.E.2d at 167. And the expert based her opinion only on "the consistency of [the victim's] statements over time," "the fact that [the victim] could provide sensory details," and that the victim's "knowledge of the sexual act [wa]s beyond her developmental level." *Id.* at 686, 747 S.E.2d at 167. This Court declared that testimony was improper because it "essentially expressed [the expert's] opinion that

[the victim] is credible." *Id.* The expert had not "personally examined or interviewed" the victim; she based her opinion entirely on what the victim said. *Id.* Hill, by contrast, personally examined both children and testified only about the medical significance of her physical findings.

Because no fundamental error occurred, Defendants cannot satisfy the first prong for plain error review.

Even if an error occurred, Defendants cannot demonstrate prejudice. *Reber* requires showing that "the jury probably would have reached a different result" without the challenged evidence—that acquittal was "significantly more likely than not." *Reber*, 386 N.C. at 159, 900 S.E.2d at 787.

Defendants cannot meet this burden. The children provided detailed testimony about multiple instances of abuse. Luke testified that Kleist made him touch Kleist's penis, inserted his penis into Luke's mouth and ejaculated, and had anal sex with him. Val testified that Kleist had vaginal intercourse with her, digitally penetrated her anus, had anal sex with her, inserted a bottle into her vagina and anus, made her perform oral sex on him, and performed oral sex on her. Their accounts were corroborated by evidence of their outcries to family members and behavioral changes observed by multiple witnesses.

The trial court properly instructed the jury on evaluating expert testimony and witness credibility, specifically reminding the jurors that they were "not bound" by expert opinions and should consider whether the opinion was "reasonable" and

"consistent with other believable evidence." Given this substantial evidence and proper instructions, Defendants have not shown that the jury "probably" would have acquitted them absent Hill's medically accurate explanation. At most, they have shown that acquittal was possible, which falls far short of the plain error standard. *See id.* at 162, 900 S.E.2d at 789 ("[I]t is certainly *possible* that the jury would have acquitted . . . . But [the defendant] has not shown that the jury *probably* would have done so.").

The trial court did not commit plain error in admitting Hill's testimony.

### III. Conclusion

The trial court erred in denying Lipscomb's motion to dismiss her convictions for aiding and abetting statutory rape and statutory sexual offense under Sections 14-27.23(a) and 14-27.28(a). No substantial evidence showed that Lipscomb satisfied either the conduct or mental state requirements for aiding and abetting. We vacate those convictions.

The trial court also erred in denying Lipscomb's motion to dismiss one count of felony child abuse under Section 14-318.4(a2) as to Luke. Without substantial evidence that Lipscomb knew Kleist had committed sexual acts on Luke, she could not have "allowed" those acts. We vacate that conviction. But the trial court did not err in denying Lipscomb's motion to dismiss the felony child abuse charge as to Val. Substantial evidence indicated that Lipscomb learned of Kleist's sexual acts on Val and took no action to prevent further acts.

- 33 -

Finally, the trial court did not err in admitting Hill's testimony. She explained the medical significance of the children's physical examinations without opining that abuse had, in fact, occurred. Her testimony fell within *Stancil*'s permissible boundaries.

VACATED IN PART; NO ERROR IN PART.

Judges CARPENTER and WOOD concur.